MARY JANE STEVENS CO. v. FIRST NAT. BLDG. CO.

No. 5029. Decided May 13, 1936. (57 P. [2d] 1099.)

*Stewart, Alexander & Budge,* of Salt Lake City, for appellant.

*De Vine, Howell & Stine* and *A. W. Agee,* all of Ogden, for respondent.

WOLFE, Justice.

This case comes to the writer on reassignment. It involves an action for damages to plaintiff's property and a prayer asking that the trial court enjoin defendant to remove alleged encroachments, all arising out of the replacement by defendant of its old building by a new thirteen-story building on the lot next to plaintiff's in Ogden City. There are one hundred and eight errors assigned by plaintiff in its appeal, and six errors by defendant in its cross-appeal. A rather complete statement of the facts is therefore necessary.

In 1878, John E. Dooley owned the lots now owned by plaintiff and defendant. The total lot was 100 feet fronting on Washington avenue and 155 feet fronting on Twenty-Fourth street. On August 19, 1878, out of this rectangular lot, Dooley conveyed to Sidney Stevens the land now owned by plaintiff. It was an L-shaped piece, 50 feet frontage on Washington avenue and 25 feet frontage on Twenty-Fourth street, the two arms of the L embracing the corner lot retained by Dooley. Dooley after this conveyance, and his successors down to and including the defendant, therefore, owned a corner lot 50 feet by 130 feet on the southeast corner of Twenty-Fourth street and Washington avenue, and Sidney Stevens and his successors down to and including the plaintiff an L-shaped piece bordering on the corner lot on two sides. Thus, the defendant's lot has a frontage of 50 feet on Washington avenue and 130 feet on Twenty-Fourth street, and plaintiff's lot has a frontage of 25 feet on Twenty-Fourth street east of the rear of defendant's lot and approximately 50 feet frontage on Washington avenue just south of the 50-foot frontage of defendant's. The dimensions here given are approximate for the purpose of identifying generally the two lots in lot 6, block 27 of Plat A, of Ogden City. Alleged discrepancies, in the actual land occupied and the actual portion of the earth's surface to which each was entitled, play an important part in the case, as we shall later see.

In 1879, Mr. Sidney Stevens constructed for himself and Dooley a brick rectangular building on both lots with approximately 100-foot frontage on Washington avenue and extending 90 feet on Twenty-Fourth street. It was a three-story building and its frontage and back were a continuous wall. A partition wall 16 inches wide (17 inches including the plastering) running east and west was constructed aboveground entirely on Dooley's (predecessor of defendant's) property with its south face on the division line, thus occupying 16 inches of Dooley's space. Below ground there was a stone wall about 36 inches wide at the top, widening as it went down about 18 inches more, which was the footing for the three-story 16-inch partition wall. Part of this foot wall was on Stevens' land. The floor joists of the first floor of both buildings rested on this stone wall. The floor joists supporting the second and third floors of the Stevens part of the building extended into the 16-inch brick wall about 6 inches and it was their only support. There were flues in this wall leading from both buildings. These facts concerning the partition wall, it is claimed, are material in the determination of whether it was a party wall or a wall belonging to Dooley with a right of support only for the Stevens part of the building. Added facts regarding this question will be later given. The facts being lengthy, endeavor will be made to point out as they are given the questions upon which they bear. These conditions existed until the fall of 1925 except for certain remodelings. The north portion of this building on the Dooley tract was used as a bank for many years. The bank faced the front of its building with brick, covering the old brick. This brick was extended to the south line of the west front and thereby extended over that part of the frontage which was coextensive with the west end of the 16-inch wall.

Starting in December, 1925, and during 1926, defendant removed its portion of the unit building and erected a new 13-story building. Out of this construction grows this lawsuit. The complaint sets out two causes of action, the first

dealing with certain alleged encroachments which it is contended constitute a continuing trespass and appropriation; the second, with damage claimed to have been caused to plaintiff's building and grounds. The 1,400-page transcript is replete with detail. We believe the reader may obtain the best grasp of the facts which bear on the matter of encroachments and damages and which it is necessary to keep in mind better to understand the legal principles which apply, if we narrate the progressive steps in the construction of the new building as far as we are able, with difficulty, to assemble and interpret them from the record.

The defendant used its full 50 feet by 130 feet for its building. The contractor, Whitmeyer & Co., began by wrecking the defendant's half of the old building. In order to do this it was compelled to use certain engineering devices to preserve the south half of that building belonging to plaintiff. It began by tearing down the north wall on Twenty-Fourth street and the west and east walls to a point nearly up to the partition wall. The problem presented itself as to how the Stevens building should be supported while the partition wall was removed and until the south wall of the new bank building was erected. In order to accomplish this, the contractor dug down under the northeast corner of the Stevens part to a point below any contemplated excavation for the new bank building, and this shaft approximately 4'x4' was filled with concrete until it reached the bottom of the stone footing heretofore mentioned which held the 16-inch brick wall; the said footing extending below the surface of the ground about 8 feet. The north side of this concrete was flush with the south line of the contemplated south wall of the bank building. But any encroachment of this column of cement underneath the northeast corner does not seem to be complained of. Next, and before the contractor removed the partition wall, the cement in the basement of the Stevens building was broken out about 3 feet along the north side, beginning at about 40 to 50 feet from the front of the building. An east and west line of holes

was drilled vertically about 3½ feet apart to a depth of 3 or 4 feet lower than the deepest contemplated excavation. Sections of 6-inch pipe were inserted in these holes coupled together, and these pipe wells were then filled with concrete. Across the top of this line of piles a large timber was laid. On this sill were placed at intervals a series of 2"x6" timbers running from the sill to a plate fastened underneath the floor joist. Similar props were placed running from the first floor to the joists of the second floor and from the second floor to the joists of the third floor. All this was done before the partition wall was removed. In fact, before anything but the roof of the bank building was removed. While the Stevens building was thus "shored" up, the walls of the bank building were removed. When the partition wall was about 75 per cent. removed, a pier was constructed under the I beam which ran along the top of the first floor in the front wall of the Stevens building and into the bank part of the building. A pier of concrete was constructed extending 18 feet underneath the surface and above the sidewalk up to the ledge in the plate-glass window. This concrete underneath was 18 inches square. On this concrete pier was constructed an additional pier of burnt brick about 12 inches wide by 16 inches deep up to the I beam before mentioned. This concrete and brick pier was entirely south of the contemplated south side of the south wall of the new bank. The brick pier did not come exactly to the I beam. In the space ¾-inch hardwood wedges were driven. It is claimed by plaintiff that owing to the settling of this pier and the crushing of the wedges together with some settling on the new bank building, the whole northwest part of the Stevens building was thrown out of plumb, causing cracks in the walls and throwing the floors out of level. More will be later said about this. The defendant claims the plaintiff consented to the construction of this pier. As this is a disputed fact depending upon a question of agency, treatment of that phase will be reserved. Plaintiff also claims damages to its building by reason of this pier having taken up

approximately 12 inches of the space formerly occupied by the plate-glass window in front of their building and that the concrete part obstructs to the extent of 18 inches the cellarway leading to the basement and occupied by the Western Union Telegraph office, a lessee of plaintiff.

We resume the narration of the progressive steps in construction, calling attention as we proceed to those features which it is claimed are encroachments or which damaged plaintiff's premises. The northeast and northwest corners of the Stevens building being thus supported and the middle being "shored" as aforesaid, a temporary wall was built between the floor and the ceiling of each floor of the Stevens building; that is, from the floor to the bottom of the joists above and from the next floor to the bottom of the joists above, direct to the roof ceiling. This wall was built of 2"x6" stringers placed about 18 inches apart. They ran from a sill running east and west along the bottom to a planking (2"x6") which ran east and west along the top of the stringers. The bottom plate rested on the flooring; the top under the bottom of the joists above. Inch lumber was nailed on the north and south side of this studding or stringers. The north side of this temporary wall formed the south side of the form for the new bank wall to come later. The joists were left extended beyond this temporary wall still inside of the old partition wall, and when that was taken down they were left protruding until the rising construction of the new wall reached them. They were then sawed off until their north ends were flush with the south line of the new concrete wall, and into the form for the concrete were fitted 4-inch angle irons with legs $\frac{5}{8}$ of an inch in thickness, so that the south face of the leg would be flush with the south face of the new wall and the north face of the angle iron embedded in the concrete $\frac{5}{8}$ of an inch (according to testimony of Piers, architect for the bank). The angle irons ran the entire east and west length of the Stevens building. Three-quarter inch bolts were laid across the form through the angle irons and double-nutted; that is, one nut

on the north face and one on the south face of the angle iron, so that the north nut was also embedded in the concrete. When the concrete poured in the form arrived at the point where the joists protruded, the latter were sawed off flush with the north side of the lumber which was to correspond to the south side of the new bank wall, so that the north ends of the joists would flush with the south face of the new concrete wall when the concrete was poured up to the height of the joists and the bolts through the angle irons below would go completely through the concrete to the north side of the wall. The bottom of the joists rests on the top face of the projecting leg of angle iron, and when the temporary wall which supported the joists was removed, some months after the concrete wall was poured (in order to let it harden), the weight of the north end of the joists together with the floors and all dead weight rested on the angle irons. This construction and manner of supporting the Stevens' joists is given in some detail because complaint is made that the type of construction not only resulted in causing the Stevens building to sag, but was inadequate safely to support the building for the purposes for which it had been used. The third floor of the Stevens building had been used as a dance hall and skating rink.

While this gives the manner in which the angle irons were attached and the final support of the joists, it must be remembered that at the time the temporary wall for the Stevens building was first erected the 16-inch brick partition wall was still standing. After the brick partition wall together with the old masonry footing on which it stood and upon which the bottom of the first floor joists of the Stevens building formerly rested was removed, excavation on the bank lot was extended under the Stevens building south to the line of 6-inch piling, and as this excavation went down lagging was placed against the piling lashed there by "U" bolts so as to keep the earth from flowing down between the piling. This excavation went down to the depth of the deepest excavation on the bank property. The forms for the

south concrete wall of the bank were constructed from this low depth. As the south side of the form for this wall was erected, concrete was poured in between this side and the lagging so as to make a footing of solid concrete for some distance above the bottom of the excavation. Before the concrete wall was poured, in fact before the forms were placed, the entire area of the bank lot at this depth was covered with a concrete mat $3\frac{1}{2}$ inches thick so as to keep out the water at those depths. A sump under the mat collected the water and it was pumped from this sump pending construction. After the concrete between the south side of the form and the lagging reached a certain distance, what was called "underpinning" was constructed. It consisted of a concrete wall, the north side of which was flush with the south face of the contemplated south concrete wall of the bank. In fact, the north face of this underpinning wall became the south side of the form for the 5-inch concrete wall of the bank as far as it extended upward above the concrete filling heretofore mentioned. The dimensions and depths of this underpinning wall, as testified to by the witness Piers, were as follows: It ran west from the rear end of the Stevens building for a distance of $36\frac{1}{2}$ feet and for that distance to a depth of 34 feet 6 inches from its top. It extended upward to 16 feet from the surface or approximately 8 feet under where the bottom of the old masonry footing for the 16-inch brick partition wall had formerly been. The width of this portion varied from a few inches to $1\frac{1}{2}$ feet. From this point $36\frac{1}{2}$ feet west of the rear of the Stevens building for approximately $53\frac{1}{2}$ feet west the width of the underpinning wall was 8 to 10 inches (according to Piers). It went to a depth of 18 feet 11 inches from its top which was approximately 16 feet below the level of the street. This underpinning wall was never removed because, the witness testified, it was meant for a support for the superstructure of the Stevens building as well as to keep out water from the bank building during and after construction. The steel piles were also not removed. These, it is claimed, are en-

croachments. We shall see that defendant disputes this because of a discrepancy of surveys which shall be later considered. The dimensions given above in detail are so the reader might have some idea of the vertical area and extent of this claimed encroachment of the wall. In a general way this completes the description of what was done in connection with the Stevens building regarding support. Other operations concern the unoccupied portion of the Stevens property on the east of the bank lot (the 25 feet fronting on Twenty-Fourth street) and that part of the Stevens lot east of the Stevens building (it occupied the west 90 feet only of the portion fronting on Washington avenue) south of the bank lot. The testimony shows that the contractor excavated on the east and then built a concrete wall from 6 to $7\frac{1}{2}$ inches thick including weatherproof pads, going to a depth of 20 feet 11 inches along the entire east side; the wall being 11 feet high. The west face of this wall was flush with the east face of the contemplated east wall of the new bank building; that is, it was entirely east of the east wall of the new bank building. It was never removed. Plaintiff claims it is on its land. South of the south line of defendant's contemplated building and east of the Stevens building excavating was also done, going down 20 feet 11 inches. Here a wall of lumber was constructed and also weatherproofed on the north side. This wall was from 6 to $7\frac{1}{2}$ inches thick and rose from the 20-foot 11-inch level about 11 feet high. Its north side was flush with the south line of the contemplated south wall of the new bank building. It was not removed. Plaintiff makes complaint that it is an encroachment. Before either of these walls was constructed, a concrete apron or mat $3\frac{1}{2}$ inches thick was laid at the bottom of the excavations and the walls built on these mats. These mats extended about 12 inches south and east beyond the south and east sides of the two walls just mentioned. The mats were to keep out moisture. Plaintiff claims that these mats, therefore, encroach on its property the width of the walls plus the additional 12 inches or about 20 inches on its

property. It will be noted that no mats extended beyond the underpinning heretofore mentioned built under the Stevens building. In this respect several of the hypothetical questions put by counsel for the plaintiff were inaccurate.

While the excavations were in progress and after they were complete, but before the walls were constructed, sheet steel piling (on the east wooden piling had first been driven later to be replaced by the steel) was driven down a distance of 20 feet 11 inches on a line approximately 2 feet 6 inches to 2 feet 9 inches (according to the witness Piers) from the east and south lines of the contemplated east and south lines of the new bank building. This piling was pressed up against the earth near the top by cribbing. Before the steel piling was put in on the east there was a cave-in due, according to the defendant, to washing out. There were 526 cubic yards of earth hauled away from the excavation or from slides. After the walls were up the excavations were refilled. Plaintiff claims the refilling was with trash, debris, and dirt which would not settle as before the earth was disturbed, and that in order for plaintiff to utilize this ground for building it would have to go down to the bottom of the excavations made by defendant for firm foundations. Disturbance of the soil and failure to replace the same with equal grade of material is one of the damages claimed by plaintiff as distinguished from encroachments. Many of the attempts of plaintiff to propound hypothetical questions unsuccessfully over objection deal with the depth which any one desiring to build a three-story building on the vacant portions of the Stevens tract would have to go and the cost thereof.

On the side of damage to the premises, plaintiff alleges that its east and west walls cracked due to settling of its building while temporarily supported by the shoring and because of some settling of the bank building after construction, taking with it the joists on the angle irons; that the floors, especially the third, were rendered unlevel; that the

angle irons are not sufficient support for its building; and that there is thus a depreciation and a damage.

To sum up, besides the matter of redecorating, relocation of a lavatory, and removal of pipes left when defendant replaced a certain toilet, the main elements of damage to the premises are: (1) Disturbances of compactness of soil requiring excavations for building on its property to much greater depth than would otherwise be required ($7,500). (2) Bent-pipe column extending from I beam in front, heretofore mentioned, to pavement ($205). (3) Extinguishment of three flues used by plaintiff which were in the old brick partition wall ($500). (4) Lessening of display space in front window due to new pier supporting the I beam and obstruction of basement entry due to the same pier ($2,500). (5) Sloping floors, unsightly and unfit for use ($1,000). (6) Third floor so weakened and sloping as to be unfit for dancing purposes ($500). (7) Weakening of the building walls due to settling, as aforesaid, and because of inferior structural support ($7,500). The total damages suffered through depreciation were alleged as $24,950. The first cause of action dealing with encroachment sets out: (a) The footings for the concrete underpinning heretofore mentioned under the Stevens building (the complaint alleges that there were concrete footings 3 feet thick *all* along the north and west sides of the Stevens lot, extending over about 21 inches, but there is no proof of this). (b) The concrete wall constructed on top of this footing along the part occupied by the Stevens building and the 6 to 7½ inch concrete wall (including waterproofing) constructed south and east of the south and east lines of the new bank building aforementioned. (c) Interlocking piling alleged to have been left in the earth east of the bank building on the Stevens property. (d) Encroachments of east and south walls of defendant's new building over plaintiff's lot from 1 to 1¾ inches and lintels 1 inch in addition, and the roof 2¼ inches at the southeast corner. (e) Mats or aprons extending over 20 to 22 inches. Other encroachments were alleged, but showing

was made that they were removed or that they did not exist, so we do not include them in this catalog of claimed encroachments. Any encroachment of the brick pier on the northwest corner was treated as damaging the building rather than as an encroachment. Plaintiff prayed for a mandatory injunction compelling the removal of them, and not for damages for the alleged continuing trespass.

The findings are lengthy (covering more than 30 printed pages) and are attacked at many points. It is claimed that in many respects they are not in accordance with evidence and that in some respects they reflect erroneous propositions of law and that in some places they are inconsistent. Many of the facts found are as set out in this opinion. We have approached the matter by attempting to narrate the various steps in the construction in the order of their taking place, while the findings merely set out the certain physical changes in the structures of the buildings before and after the new bank building was erected. The findings hold that there was knowledge on the part of plaintiff of what defendant intended to do or what it was doing without protest. In other matters the findings not only find knowledge but also consent on the part of plaintiff. We believe the most expeditious and the clearest method of treating these one hundred and fourteen assignments of error raised by both plaintiff and defendant in their appeals will be to lay down certain propositions for consideration. Accordingly as those propositions are decided, will many of the assignments stand or fall.

The court refused to issue a mandatory injunction or any injunction, except to prevent defendant from opening out the windows on the south and east sides and requiring defendant to reconstruct the windows so they would not open out or over plaintiff's property. It stated that it was unable to determine from the evidence how much or to what extent the floors settled or the walls cracked as a result of the tearing down of the old building, and consequently makes no finding as to elements of damage (5), (6), and (7), above

set out, except as to that part of (7) wherein damage is claimed because of inferior structural supports as compared with the support the joists had in the old brick wall. The court finds the supports were adequate and as stable and secure as the joists formerly had been. As to testimony of the display space and the basement entryway (4), above, the court finds the construction of the brick pier was with the consent of plaintiff and therefore that it cannot claim damage. As to damage for removal of subsoil and replacement by alleged inferior materials and soil, (1), above, the court finds it in no way diminished the market value of the land. To repair the bent-pipe column, (2), above, $75 was allowed. The court allowed $216.50 for redecorating rooms; $25 for the removal of two iron doors; and $69.75 for refitting doors and windows on the second floor; and for removal of a platform and protruding pipe $15.

On the matter of encroachments, the court found that the concrete footing and walls and mat constructed beneath the surface, (a), (b), and (e), above, were below the basement floor of plaintiff's building and could cause no inconvenience or damage to the present use by plaintiff of its building; that they could not be removed by defendant; that they (the walls) were to avoid injury and damage to plaintiff's property; that if, in the future, plaintiff desired to remove its old building and construct another in its place which required no deeper basement, the walls would provide as good a support as the subsurface which was replaced by the walls, and if plaintiff desired to go deeper the removal of the walls would be no more costly than removing soil which the walls replaced (findings VIII and XIV). In finding IX, however, the court gave $2,822 for the continuing trespass constituted by these encroachments until plaintiff desired to remove the same. This was on the basis of $200 a front foot for the encroachments on the east side ($332), and $1,500 a front foot for the encroachments on the south side ($2,490). The court found that all the piling had been removed, (c), above; therefore they formed no permanent encroachments

(finding XV). As to the extension of the south and east walls at places over plaintiff's land, (d), above, the court found that they were unintentional and may have been due to a variation in the survey and were so small as not to be susceptible of substantial damages (finding IX). More specific treatment of these findings will, in some instances, be given after the legal propositions are considered. The defendant attacks finding IX on three grounds: First, that there is no evidence that the mat on which the false walls were built extends over plaintiff's property for 130 feet on the south side, but only from the northeast corner of plaintiff's building east 40 feet. The defendant is correct in this regard, but there was evidence, if we correctly interpret it, that concrete had been poured between the lagging along the cylindrical piles and the south line of the new bank building for a certain height on which the 7½-inch concrete wall was constructed. While no accurate dimensions of the width of this seem available from Exhibit 7, it would appear to have been about 18 inches. Some countenance is given to this because a space of about 3 feet of the cement floor of the basement was broken away in order to drill the holes for the piles. This line of piles did not go the whole length of the Stevens building, however. Since, on account of other errors, the case will have to be reversed and tried anew, it will profit nothing to consider each discrepancy, inaccuracy, or error in the findings, for it is to be assumed that the trial judge retrying the case will note the evidence as it appears in the retrial and make findings accordingly and that this evidence will make explicit matters which were not clear on the original trial. This is the sort of case where it is more necessary to lay down principles for the guidance of the parties in the retrial than to ferret out errors in the last trial. In a case with so much detail and important legal principles involved, it would be surprising indeed if substantial errors would not have been committed.

The defendant in its cross-appeal also attacks that portion of finding IX which finds that any portion of the wall of

defendant's new building encroaches on the land of appellant and that the finding is in error when it determines that the mat encroached on plaintiff's ground ■■ 20 inches, because it did not encroach more than 11 inches. The reason defendant makes this contention is because it claims that the portion of the earth's surface to which plaintiff is entitled to really lies 9.6 inches south and 9.72 inches east of the land as shown by surveys of the witnesses Hall, Schick, Craven, Tracy, and Brown, for the reason that the old and true monument from which they should have started their surveys was about 10 inches east and 9.5 inches south of the present marking in the intersection of Twenty-Fourth street and Washington avenue. In other words, to find the actual piece of earth's surface to which plaintiff and defendant are entitled, we must pick up the lots as found by the recent surveys of the above-named men and place them down approximately 9.72 inches east and 9.5 inches south. Then the boundaries will thus encompass the actual piece of earth to which the parties are entitled. If this were true the real north and south boundaries of defendant's land would be moved south 9.6 inches and the west and east boundaries east 9.72 inches. This would mean that the concrete supporting walls (sometimes called "false walls") which are not more than 8 inches wide would be entirely on the actual piece of earth defendant is entitled to, and instead of the mats being over on plaintiff's land 20 inches, they would only be over between 10 and 11 inches. And the south and east walls of defendant's building and lintels would not be over at all. The defendant makes a persuasive case: Washington avenue is 132 feet wide; Twenty-Fourth street is supposed to be 100 feet wide. The monument from which Hall and others made their surveys was located at the intersection of a line 10 feet west of the center line of Washington avenue and the center line of Twenty-Fourth street. The distances call for the northwest corner of defendant's lot as 76 feet east and 49½ feet south of this monument. There is evidence (Mr. Craven's testimony)

that the original monument 40 years ago was a sandstone block 6 or 8 inches square with its upper surface 6 inches below the then unpaved level of the street. This monument (according to Craven) was moved from the intersection of Washington avenue and Twenty-Fourth Street to a point 10 feet west on account of the laying of the first street car tracks. When the street was paved about 1903, another monument of concrete was set up. At this time there was only one car track on Washington avenue. Later two tracks were laid, when another monument was installed. It is defendant's contention that the spot where the present monument was placed was in all these resettings out about 10 inches east and 9½ inches south from where it should be. The argument is plausible: The evidence shows that the front of the Stevens building (west side) which was coextensive with the front of the old bank building is 76 feet 9.72 inches east of the north and south line running through the present monument, hereafter called the monument line. The other property fronts on the east side of Washington avenue vary from 76 feet 9.60 inches (the Stevens property) down to 76 feet .12 inches east of the monument line. On the west side of the street they vary from 55 feet 1.20 inches to 55 feet 11.76 inches, all being short of the 56 feet. Thus, argues defendant, the original monument from which the calls in the descriptions were originally taken threw the west property lines of the lots on the east side of Washington avenue back more than the 76 feet from the present monument line and the property lines of the lots on the west side less than 56 feet west of the present monument line. Much the same argument is made concerning the north and south property lines on Twenty-Fourth street, only the evidence is not as strong. It is found that an old building on the north side of Twenty-Fourth street just opposite the entrance of Canal alley which lies just east of the Twenty-Fourth street frontage of plaintiff's property, extends into what is now Twenty-Fourth street. In other words, the distance to the front of this building from the present outer line of Twenty-Fourth

street is only 48.7 feet instead of 49.5 feet which it should be, a difference of .8 feet or 9.6 inches. It is thus argued that the north boundary of Twenty-Fourth street was formerly 9.6 inches south of where it now is. This, however, savors of trying to prove the presence of summer by one swallow. The deduction which is made from all this is that the original monument was south and east of the present monument and that, therefore, the actual portions of the earth's surface to which plaintiff and defendant are entitled lie south and east of the portions called for by the descriptions as tied into the present monument; that, therefore, there really are no encroachments as alleged by plaintiff. Some semblance is also lent to this argument by the fact that there is an excess of 1 foot 9.24 inches between the east wall of the new bank building and the Peery building on the east of plaintiff's 25-foot strip, the present west city line of the alley to the west of the Peery building being 1 foot 9.24 inches east of the 25-foot strip of plaintiff's which fronts on Twenty-Fourth street and which lies between the west line of the alley and an east line of the new bank building. It is also shown that from the south face of the new bank building to the south face of the Stevens building it is 50 feet 2⅛ inches instead of 50 feet measured along the west side of the buildings. The court made no direct finding as to the fact of this claimed difference between the old and more recent monuments, but implied in its findings relating to the distance of the encroachments of the wall and mats is a finding that the present surveys starting at the present monument are correct. We cannot disturb this implied finding. There is sufficient evidence to support it. In the first place, there is the present existing monument. It is presumed to be correct. That it is at a different place than the original monument rests on making the deductions which we have just mentioned. And the locations of the building fronts on the east side of Washington avenue upon which the deduction rests themselves vary from approximately 76 feet from the present monument line on Washington avenue to 76 feet

9.72 inches. It is just as logical to conclude that some of the owners failed to build up to the real property line as it is to conclude that others built beyond it. The deduction rests too much on speculation. Also there was evidence that the property lines as found by the surveys tied to the present monument were fairly consistent with the surveys as found by tying into the monuments one block east and one block south. The present monument was 766 feet 8.64 inches north of the monument at Twenty-Fifth street and Washington avenue, which was 2.64 inches longer than the records in the city engineer's office. From the monument at Twenty-Fourth street and Adams avenue one block east to the present monument, it was 787 feet or 6.24 inches longer than the city engineer's record. The surveyors testified that these discrepancies might be expected and reflected human error in measuring and contraction of chain because of temperature. If no allowances for error are permitted, it not only fails to show a displacement of the present monument at the intersection of Twenty-Fourth street and Washington avenue as north and west of the supposed location of the old monument, but rather a displacement south and east which would make defendant's case worse.

We must, therefore, assume that the court was correct in finding that there were encroachments to the extent found at least as far as pertains to the mats, lintels, and walls. Respondent's first assignment of error is, therefore, not well taken. However, it should be remarked in juxtaposition to this conclusion that the doubt as to the true monument, and hence as to whether defendant's lintels and wall may not really be on his true ground, may play some part in the matter of requiring defendant to remove them. Later consideration will be given to this matter:

The next question is as to whether the defendant had the right to remove the division wall. Both parties evidently assume that this question depends on whether the division wall was a party wall or a wall belonging to appellant with an easement for support in favor of plaintiff. We doubt whether under the modern cases there is

any difference in the right to remove where the old wall is insufficient to support the contemplated new building. The majority of cases, especially the older cases, held that a party wall partly on adjoining lands was held in severalty; that is, each owned that part of the wall located on his own land with cross-easements in the other's part for support.

Other cases hold the whole wall was owned in common by the two owners. *Everett* v. *Edwards*, 149 Mass. 588, 22 N. E. 52, 5 L. R. A. 110, 14 Am. St. Rep. 462. Although the right to remove and rebuild would be the same, according to *Putzel* v. *Drovers' & Mechanics' National Bank*, 78 Md. 349, 28 A. 276, 22 L. R. A. 632, 44 Am. St. Rep. 298, whether held in severalty or in common. As a logical result of the first conception, neither owner could pull down the other's property without his consent. This physically resulted in his not being able to tear down his own part because he could not pull down his part without destroying his neighbor's part. Thus, it was said that a party wall could not be removed by either party without the consent of the other. *Partridge* v. *Lyon*, 67 Hun, 29, 21 N. Y. S. 848; *Potter* v. *White*, 19 N. Y. Super. Ct. 644, 645; *Eno* v. *Del Vecchio*, 11 N. Y. Super. Ct. (4 Duer) 53; *Fowler* v. *Saks*, 18 D. C. (7 Mackey) 570, 7 L. R. A. 649, at page 654. This was the earlier rule. But while the true party wall must stand on the division line, it came to be recognized that division walls by long usage took on the character of party walls even though wholly situated on the land of an adjoining owner. *Weadock* v. *Champe*, 193 Mich. 553, 160 N. W. 564, Ann. Cas. 1918C, 874. In many states the right of either adjoining owner to build a party wall partly on the land of his neighbor was given by statute. Thus, party walls came about in three ways: By agreement, by prescription which presupposed a grant (therefore, in a sense, also an agreement), and by statute. But where they arose by prescription and where wholly on the land of one lot owner, it was practically the same as the conception argued for by defendant, to wit, total ownership in the party

on whose land it was located with an easement for support in favor of the neighbor. This difference in conception between a strict party wall, and a wall wholly on the land of one with rights for support, seems to be recognized in *Barry* v. *Edlavitch,* 84 Md. 95, 35 A. 170, 33 L. R. A. 294; *McLaughlin* v. *Cecconi,* 141 Mass. 252, 5 N. E. 261. We have no statute in Utah governing the erection and use of party walls. In the instant case there is no evidence of any agreement as to the nature of the partition wall. The footings were partly on plaintiff's land. The part above the surface wholly on defendant's land. The wall with the rest of the building was built by Sidney Stevens, predecessor in interest of plaintiff. What the arrangement between him and Dooley was does not appear. Who paid for the wall does not appear. Why it was built solely on defendant's land does not appear. It does appear that when the old bank front was refaced, Stevens consented that it should cover the party wall. This is some slight evidence that the bank recognized plaintiff's interest, but it may have also been a courtesy, but would hardly be sufficient to rebut the inference which might arise from the fact that the owner of the south tract who built the wall built it wholly on the Dooley tract. The bank sought consent of Stevens to extend the cornice of the first floor over said wall. An entry way was broken through the wall on the third floor with fire doors on each side in order to permit members of the lodge occupying the third floor of the old bank building to use the dance floor on the third story of the Stevens building. Of course, the parties would have to consult about this regardless of who owned the wall. The outstanding fact remains that the wall is a division wall; that for a long time more than the prescriptive period it was used to support the joists of both buildings which projected into it about 6 inches; that flues from both buildings were built into it; that the building with its two parts was all constructed at one time. It has been held that a separation wall between two buildings is presumed to be a party wall. 47 C. J. 1327, § 9. "Every wall of separation

between two buildings is presumed to be a common or party wall, if the contrary be not shown; and this not only is a rule of positive ordinance, but is a principle of ancient law." Washburn's Easements and Servitudes (4th Ed.) 611; *Weadock* v. *Champe,* supra; *Campbell* v. *Mesier,* 4 Johns. Ch. (N. Y.) 334, 8 Am. Dec. 570 (Chancellor Kent) ; *Bellenot* v. *Laube's Executor,* 104 Va. 842, 52 S. E. 698. This presumption that a separation wall is a party wall in the sense of a tenancy in common does not hold where the wall is wholly on the land of one owner. *Wert* v. *Thompson Co.,* 234 Ill. App. 458; *Brown & Hamilton Co.* v. *Johnson,* 251 Pa. 378, 96 A. 823; *Bright* v. *Morgan,* 218 Pa. 178, 67 A. 58, 11 Ann. Cas. 626. While the distinction between a true party wall, that is, one owned in severalty or in common, and a wall which while wholly on one person's land has for the prescriptive period been used by an adjoining owner, may be important in questions which involve the right of the one on whose land it is not situated to heighten the wall or to further burden it, it is not important on the question of whether the person on whose land it is situated has the right to tear it down for the purpose of rebuilding a structure which it is insufficient to support. Where a party has only a right arising by prescription, his use is limited to the extent to which it has been used without any right to put any further burden upon it. *Wert* v. *Thompson Co.,* supra; *Brown & Hamilton Co.* v. *Johnson,* supra; *Bright* v. *Morgan,* supra. The old cases held that a true party wall could not be torn down without the consent of the other party. See supra. The more recent cases, recognizing the dictates of modern necessity and progress, hold that a party wall insufficient to support the structure which one of the lot owners desire to build in place of his present building may be leveled and rebuilt provided the other obtains the support for his building that he formerly had. Whether he is entitled to exactly the same type or kind of support or only equal support we shall later consider.

Chancellor Kent assumed such right. He says in volume 3, p. 437, of his Commentaries:

"If there be a party wall between two houses, and the owner of one of the houses pulls it down in order to; build a new one, and with it he takes down the party wall belonging equally to him and his neighbor, and erects a new house and wall, he is bound on his part to pull down and reinstate it in a reasonable time, and with the least inconvenience."

In *Duhme* v. *Jones,* 8 Ohio Dec. (Reprint) 757, it was said:

"Upon the claim specially made by the tenant that the wall is not in a ruinous or unsafe condition, and that the defendant could not under any circumstances, remove a brick in a common wall that might tend to weaken it without his consent, if this were the only question of law involved, the court would have little hesitancy in saying that the decisions of the supreme court of this state in two cases clearly indicate that the old doctrine, adhered to yet in many of the American courts, that a party wall cannot be taken down in part where an adjoining proprietor desires to improve his property without the other's consent, is not recognized as law in Ohio. The case of *Hieatt* v. *Morris,* 10 Ohio St. 523 [78 Am. Dec. 280], was the first departure from the old doctrine, and while it has been characterized by some text writers as not of very high authority, there is a virtual affirmation of the doctrine, though in a different form, in the case of *Mullen* v. *Stricker,* 19 Ohio St. 135 [2 Am. Rep. 379]. * * *

"The old doctrine is held to be unsuited to this age of improvement and advancement, and wholly unadapted to densely populated cities where every person in purchasing real estate, unless the deed contains some restriction, expects he will have the full right to build upon his property as he may see proper."

*Evans* v. *Shephard* (1920) 81 In. App. 147, 142 N. E. 730, first has the appearance of an adherence to the old doctrine, but closer examination reveals the fact that the wall was built entirely by Shephard's predecessors in interest and Evans had no right in the old wall, or, if a right, only to a certain easement, and that he subjected the new wall he constructed in its place with additional burdens which were a nuisance to Shephard. Equity compelled him to abate the

nuisance. In *Lexington Lodge* v. *Beal,* 94 Miss. 521, 49 So. 833, 834, a case where, like the one at bar, the footings were on both lots but the upper portion wholly on complainant's lot, the court said:

"But this ownership has throughout been burdened with an easement or servitude in favor of the owners of the adjoining lot, who have an undoubted right to have the wall in question treated as a party wall. We deem it immaterial to inquire whether the wall rests wholly on the said strip of land, or whether, as appellee contends, some part of it, or at least some part of its footings, project on her lot—a question that might be very material if the wall had been *totally destroyed,* and it was purposed by either party to rebuild it without the other's consent." (Italics added.)

In that case part of complainant's building had been destroyed by fire, but as in the case of *Commercial National Bank* v. *Eccles,* 43 Utah 91, 134 P. 614, 617, 46 L. R. A. (N. S.) 1021, Ann. Cas. 1916C, 368, the party wall remained strong enough to support the adjoining owner's building. The implication from this case and the Commercial National Bank Case is that even where a building is not injured requiring reconstruction, a new building may supplant the old, and if the party wall is insufficient to support the new building it may be removed and another substituted. The real basis of these cases is that even though a wall is sufficient to support present buildings where one of the owners desires to erect in place of his present building a new one which the present party wall is insufficient to support, he may remove the old wall and erect a new one sufficient to support his building. He does not have to wait for his building to be destroyed to do this. If the party wall is destroyed, he can do it. If it is left intact but the remainder of his building is destroyed, he can put up a better building in its place and rebuild the wall if necessary to do so. And if by choice rather than by compulsion of fire he desires to rebuild, he may also remove the wall. See, also, *Perry* v. *Reeve,* 56 App. D. C. 243, 12 F. (2d) 184; *Evans & Watson* v. *Jayne,* 23 Pa. 34.

If one owner has a right to replace the wall in a case of a true party wall, certainly he would have the right where the wall was wholly on his land and the wall obtained the character of a party wall by a prescriptive use. Whether this is a true party wall or one only in which plaintiff obtained a right of support need not, therefore, be decided. For the reader who desires to pursue the question of whether a wall situated as was this is a true party wall or one which by long usage has attained the character of a party wall, or whether one in which the adjoining owner has only a right of support, we call attention to the following cases: *Trulock* v. *Parse*, 83 Ark. 149, 103 S. W. 166, 11 L. R. A. (N. S.) 924; *Molony* v. *Dixon*, 65 Iowa, 136, 21 N. W. 488, 54 Am. Rep. 1; *Tate* v. *Fratt*, 112 Cal. 613, 44 P. 1061; *Glover* v. *Mersman*, 4 Mo. App. 90; *Pearsall* v. *Westcott*, 30 App. Div. 99, 51 N. Y. S. 663; *Appeal of Western Nat. Bank*, 102 Pa. 171 (influenced by statute); *Bright* v. *Allan*, 203 Pa. 394, 53 A. 251, 93 Am. St. Rep. 769; *Bloch* v. *Isham*, 28 Ind. 37, 92 Am. Dec. 287; *Mercantile Library Co.* v. *University of Pennsylvania*, 220 Pa. 328, 69 A. 861 (influenced by statute); *Milne's Appeal*, 81 Pa. 54; *Fleming* v. *Cohen*, 186 Mass. 323, 71 N. E. 563, 104 Am. St. Rep. 572; *Dunscomb* v. *Randolph*, 107 Tenn. 89, 64 S. W. 21, 89 Am. St. Rep. 915. It is not necessary in this case to decide whether a lot owner whose building is supported by a wall wholly on the land of his neighbor would have the right to replace that wall if it were insufficient for a larger building which the first owner contemplated building on his land. Whether such wall would gain the "character of a party wall" to such an extent as to permit such owner, the same as an owner on whose land the party wall is situated, is not before us.

Having decided that defendant had the right to remove the wall if insufficient for a larger building, it becomes unnecessary to determine whether plaintiff consented as contended by defendant. While reasonable notice to plaintiff so it might prepare for the inconvenience and protect itself would be necessary, consent was not.

The next question arises as to what support the new wall must furnish. Must it be exactly the same support in kind and extent or equal support? The defendant contends the latter and that the angle irons did give support equal to the joists when they extended into the old wall. Plaintiff maintains if the wall can be removed that it is entitled to like support in kind and strength. If it were certain that this wall was owned in severalty or in common, the plaintiff's position would have a logical basis. Then it might well be argued that the defendant must replace plaintiff's property in as near the same way it was as possible unless plaintiff consented to a different arrangement. Having its joists protruding in its *own* wall, the other could not, perhaps without its consent, do otherwise than give it back its wall or a better one with exactly the same kind of support. The theory that a party wall was owned in severalty arose from the fact that a part was on each adjoining owner's land. Each owned individually that part of the brick and mortar mass resting on his land. That conception hardly fits this case. The next conception that this wall is owned in common although entirely on defendant's land may or may not be true. What we do know is that by long usage at least the wall took on the character of a party wall. An examination of those cases which so hold can hardly be pressed to hold any other result of such holding than that the other party has an easement for support. In none of them which we have examined was it necessary to determine whether the incident of common ownership followed from such holding. Several cases, on the other hand, held that the owner on whose land the wall wholly stood might do with such wall, which "took on the characteristics of a party wall," anything which was not inconsistent with the other's right of support. The wall might be heightened and windows put in above. In other words, the court's holding that the wall took on the characteristics of a party wall still held that the other user was limited to the use with which the wall had become burdened, thus rather revealing that they

did not believe it took on *all* the characteristics of a party wall. See *Putzel* v. *Drovers' & Mechanics' Nat. Bank,* supra. There may be some doubt as to whether one owner replacing a true and strict party wall may place openings in the heightened portion. *Tate* v. *Fratt,* supra. In so doing, he places an opening in that part of the wall superimposed on the land of his neighbor. 20 R. C. L. 1095, § 181; note 92 Am. Dec. 297. However, it is not necessary for us to decide that point. We do decide that in this case, there being no showing that plaintiff had any ownership in the actual material constituting the old wall and it being wholly on defendant's land above the surface of the ground, defendant only owed plaintiff an easement of support for the present building of the latter or one built in lieu of it equal in strength and adequacy but not of the same kind as plaintiff formerly had. The court found that the angle irons with the lateral timbers holding the joists apart gave plaintiff's building support equal in strength and adequacy to that which it formerly had (Finding XIX). There being sufficient evidence amid conflicting testimony to support this finding, we will not disturb it.

The next question concerns the duty of defendant toward plaintiff in reconstructing its building. Is defendant an insurer of plaintiff against the latter suffering any damage? Or is it only required to use due care in protecting plaintiff from damage, or is there some intermediary measure of duty? The paramount rule is that every man may enjoy his property as suits him provided he does not interfere with a similar right on the part of his neighbors or infringe the rights of the public. In 47 C. J. 1348, § 52, it is said:

"Some authorities broadly state the rule that one owner of a party wall is liable to the adjoining owner for all damages caused by making repairs to or demolishing and rebuilding the wall. * * *"

Of the authorities cited in support, *Nippert* v. *Warneke,* 128 Cal. 501, 61 P. 96, 270, simply states that the complaint

did not allege lack of ordinary care or skill and that therefore the only question to be decided was whether sufficient notice was given. In *Fowler* v. *Saks*, 18 D. C. (7 Mackey) 570, 7 L. R. A. 649, it is said that the statute permitting the party wall to be taken down, gave a right not given by the common law (referring to the old rule that a party wall could not be removed without consent of both parties), but that the common-law liability for consequences of removal was not disturbed by the statute. At common law, however, the remover was liable for all damages because the removal was a wrong and a trespass. It is difficult to see why, if the statute made it rightful, the obligation would remain the same as when it was wrongful. In *Arrick* v. *Fry*, 8 App. D. C. 125, the reason for holding a remover for all damages consequent on the removal is correctly given. It is because the statute of the District of Columbia said, "and he shall also make good *all* damages occasioned thereby to the adjoining owner or his premises." (Italics supplied.) In *Potter* v. *White* (1860) 19 N. Y. Super. Ct. 644, it was held that the removal was wrongful and a trespass. Likewise, in *Schile* v. *Brokhahus*, 80 N. Y. 614, the damage grew out of a wrong. In *Earl* v. *Beadleston*, 42 N. Y. Super. Ct. 294, the main question was whether an owner was responsible for the negligence of his contractor, but the court said: "The defendant had the right * * * to take down his own house, excepting such part of it as was a portion of the party-wall." If the weakening of the party wall perpendicularly was a necessary consequence of taking down the house, then the party wall itself not having fallen into decay, the defendant would be responsible for the damage of the plaintiff's home falling because of the weakened party wall. It would seem that if it was an unnecessary consequence he would also have been liable. In *Brooks* v. *Curtis* (1860) 50 N. Y. 639, 10 Am. Rep. 545, it was held that a party had the right to increase the height of the wall but did so at his peril and was liable for all damages resulting. *McGlumphy* v. *Lentz*, 69 Pa. Super. 36, held that where an old wall which bulged was

taken down and the beams of plaintiff's building did not reach to the new wall, defendant was liable; the court contenting itself with saying that the damage done should not be borne by the plaintiff while all the resultant advantages accrued to defendant. The court further said: "It is conceded that the new wall was not negligently built, but was constructed in strict compliance with the law in force regulating this subject." But the new wall was built along the exact boundary line instead of the "consentable line" and for that reason the gap occurred. The case must stand for requiring the builder to respond for damages not caused by negligence. The court admitted defendant's right to remove the old wall. The statute permitted it. In *Berry* v. *Todd*, 14 Daly, 450, 15 N. Y. St. Rep. 371, the court, relying on the Brooks Case, held that the builder of the additional height was absolutely liable for any damage to the adjoining premises which his work produced. It would have been otherwise had he been repairing the wall. Holding defendant absolutely responsible for damage even when he has the right to remove the wall is founded on recognition of the principle that if he lessens his neighbor's right to enjoy his property by damaging him in enhancing the enjoyment of his own, he should pay the damages. Thus, the distinction in the Berry Case between repairing the wall which benefited both and rebuilding purely for his own benefit. It seems to comport with justice and fair dealing for the law to say:

"You have a right to tear down and rebuild if you can increase the enjoyment of your property, but if in doing it you damage your neighbor in any way, he should not be made to suffer by your increased enjoyment. You must include his damages in your building costs."

Other cases hold that where the damages are not initiated in a trespass the measure of the duty is to use ordinary care to protect the adjoining owner. Said Lord Blackburn in *Hughes* v. *Percival*, 8 App. Cas. 443, at 446:

"The defendant had a right so to utilize the party wall, for it was his property as well as plaintiff's. * * * But I think the law places upon the defendant, when exercising this right, a duty toward the plaintiff. I do not think that duty went so far as to require him absolutely to provide that no damage should come to the plaintiff's wall from the use he thus made of it, but I think that the duty went as far as to require him to see that reasonable skill and care were exercised in those operations which involved a use of the party wall, exposing it to this risk."

But in that case the question really was as to whether he could get rid of the responsibility by delegating the performance to a third person. In the case of *Levy* v. *Fenner,* 48 La. Ann. 1389, 20 So. 895, 901, the facts were much the same as in the instant case—cracks, unleveling of floors due to improper shoring being alleged to have occurred while defendants were erecting a new, larger, and heavier building. The court quotes from *Heine* v. *Merrick,* 41 La. Ann. 194, 5 So. 760, 6 So. 637, to the effect that defendants exercised an absolute right conferred by law; that they were not bound to indemnify their neighbors for any inconvenience *necessarily* occasioned by the exercise of the right. In this case it appeared that every reasonable precaution had been taken, but owing to the bad condition of the adjoining building it was injured. The court said, however, that the plaintiff had the burden of proving that the injury occurred "through the negligence, carelessness, or want of skill on the part of the defendants' contractor." In *Loney* v. *High,* 13 La. 271, it was said:

"The privilege * * * of building houses contiguous to those of their neighbors, and for that purpose to demolish and rebuild the walls of the latter, is one which cannot be exercised *with too much care and attention.*"

The cases of *Maypole* v. *Forsyth,* 44 Ill. App. 494; *Partridge* v. *Gilbert,* 15 N. Y. 601, 69 Am. Dec. 632; and *Partridge* v. *Lyon,* 67 Hun, 29, 21 N. Y. S. 848, all cited by note 48 on page 1348 of 47 C. J., are cases where the wall was repaired or had to be demolished because it was in

ruinous condition. This being for the benefit of both parties, the defendant would only be liable for failure to use proper skill. The case of *Lexington Lodge* v. *Beal*, 94 Miss. 521, 49 So. 833, 835, states:

"This right * * * must be exercised so as to work no *avoidable injury* to the owner of the adjoining building. He will be liable if the work is done negligently and damage to the co-owner results therefrom." (Italics ours.)

The statement was purely dicta because the lodge brought a bill in equity to prevent the neighbor from interfering with its tearing down the partly damaged yet ample party wall. It was to obtain an opinion in regard to its right to tear down that the bill was brought. It involved no question of damage because work had not yet been done. This court in *Commercial Nat. Bank* v. *Eccles,* supra, relying on *Lexington Lodge* v. *Beal,* stated:

"But in doing so he is bound to use *ordinary care* to avoid injury to respondent's building." (Italics supplied.)

This was also dicta, no question of damage being present, but only the question of whether Eccles had the right to tear down the wall. In *Buck* v. *Weeks,* 194 Pa. 522, 45 A. 325, the action was for trespass. The court said no trespass had been shown, and then spoke by way of dicta as follows:

"There was not the slightest evidence that the work was done in an unskillful or negligent manner * * * or that any injury or inconvenience was caused the plaintiffs *except such as was the unavoidable consequence of the exercise of a lawful right by the owner of the adjoining property.*" (Italics ours.)

But the court went on to say:

"Whether, under this form of action, a recovery could be had for the damages to the plaintiffs' property *which were not the result of negligence,* and to what extent the liability of an owner who repairs or removes a party wall without negligence is enlarged by section 9 of the act of June 8, 1893 (P. L. 360), it is unnecessary to consider,"

thus seeming to recognize that there might be an obligation to pay damages even though there was no negligence. In *McGlumphy* v. *Lentz,* supra, decided much later in 1918, the builder was held without regard to negligence. In *Swisher* v. *Sipps,* 19 Pa. Super. 43, the court made a distinction between the necessary and inevitable inconveniences and damages to the adjacent owner's building and sustained a charge which said:

"All he has to do is to exercise his right in such a way as not to injure his neighbor, to take reasonable care, and to use reasonable diligence in what he does so as to save his neighbor from any injury to his property."

In 20 R. C. L. 1097, § 21, it is said:

"According to numerous authorities, while a part owner of a party wall has the right, in absence of agreement or statute to the contrary, to build the wall to a greater height *he is liable* in damages to an adjoining owner if he interferes *in any way* with his right of full enjoyment of his adjoining property. * * *" (Italics supplied.)

As to the latter part of this statement, it is supported by statements of like nature in 89 Am. St. Rep. 931 and 92 Am. Dec. 295. These notes all refer to the right of elevating an already substantial wall. When we follow the trail back to the authorities supporting these notes, we find that they are based on *Brooks* v. *Curtis,* supra. We see no difference between the duty owed to an adjoining owner where one has the right to raise a wall and where one has the right to rebuild it because not sufficient for the new structure. Where the right is conceded, the duty toward the neighbor should be the same.

The upshot of our investigation is: That very few decisions are clear-cut on the duty of a rebuilder of a wall toward his neighbor; that many of the decisions held him absolutely responsible because they were founded on the old doctrine that he could not tear down a wall where it was sufficient for the structure it was designed to support with-

out the adjoining owner's consent; that, therefore, when he did tear it down without that consent he was guilty of trespass and liable for all damages growing out of the wrong. Others confused the duty in tearing down a wall purely for the builder's benefit with the duty when it was ruinous or dilapidated and both owed the duty to repair or rebuild and such rebuilding was for the benefit of both; that there is no difference in the duty between the case of raising a wall for the sole benefit of the one desiring the addition, and tearing down a substantial wall because inadequate for the new structure contemplated by the demolition; that *Brooks* v. *Curtis,* supra, and *Eno* v. *Del Vecchio & Snyder,* 13 N. Y. Super. Ct. 17, held he could raise the wall but did it at his peril. The case of *Negus* v. *Becker,* 143 N. Y. 303, 38 N. E. 290, 25 L. R. A. 667, 42 Am. St. Rep. 724, qualified the absolute statements of *Brooks* v. *Curtis* but did not overrule it. On the other hand, we have the dicta of Lord Blackburn and the Louisiana cases and *Lexington Lodge* v. *Beal,* supra, and possibly the New York case of *Negus* v. *Becker,* supra, which make the duty only one of exercising care, and diligence in raising the wall or in replacing it. In all the other cases where diligence and care were spoken of, they were either thrown in gratuitously as a finish to a statement regarding the right to replace or raise the wall as in the Eccles Case, or the work being done was repairing a weakened wall or rebuilding a ruinous one.

We think the rule which comports with justice is that he who removes a party wall or a wall in which his neighbor has the right of support for his own legitimate purposes, where such wall is sufficient to support the presently existing buildings, is not in such removal an insurer against injury to his neighbor or under absolute duty to avoid injury to the latter, but he must use the highest possible care to prevent and avoid such injury which may be caused as the natural and proximate result of his building operations. The court was in error in limiting the issue as to whether there

was negligence and carelessness in the construction of the building (findings XV and XXI).

We next consider the question of the measure of damages. Allegations of damage fall into four classes: (1) Disturbance of the subsoil. (2) Damage to the building. (3) Encroachments under the ground. (4) Encroachments above the ground which are sought to be enjoined. The measure of the damage to the subsoil is the difference between the market value of the land immediately before and after disturbances, disregarding any increase in value contributed by the new building. The smallest section of land that contains the disturbed portion, and which would naturally or by good realty practice be severable as a single unit for building, is taken. It is the damage to so much of the whole of the lot the value of which is affected, and not just the ground disturbed which is taken as the unit. If the value of the whole of the land is affected by the disturbance, then the whole is taken. Embedded in this difference in value, if any, is the element of difficulty and cost in building various types of buildings for which the lot is suitable. The theory is that a person purchasing the lot with knowledge of the disturbed subsoil would take into consideration the costs of deeper excavations for certain types of buildings which might, had it not been for the disturbance, not required such deeper excavations. Any encroachments under ground which might have to be removed are also taken care of the same way. *Ackerman* v. *True*, 175 N. Y. 353, 67 N. E. 629. If they are distributed under the edges of the whole part of the unimproved portion of the land as the mats and false walls in the instant case, the complete unimproved portion of ground would be taken as the unit. But all of these elements must be included in one hypothetical question. The difference in value after disturbance of the subsoil and the difference in value with the subsurface encroachments must be taken together. The fact is that if a heavy building were to be erected the depth to which the building might be compelled to go would be such as to make the former disturbance

no detriment and perhaps an asset. However, the effect on the value of the land for any reasonable purpose to which it could be put would be reflected in the difference before and after disturbance. Likewise with the subsoil encroachments. The mats and false walls for some buildings would not interfere; for other structures they might have to be removed and the cost of removal above that for simply removing natural soil would enter into the opinion of value. The cost of excavation above that entailed in removing the original soil without the impediments, and the cost of a deeper excavation than would have been necessary had not the soil been removed, are not proper elements of damage. They would be elements on which an expert opinion might be based or matters for cross-examination. But they may be introduced in evidence as an aid to the court or as a check-up.

For the improvements, the situation is somewhat different. It may be the diminution in market value of the building as it was after the damages compared to what it was before, or it may be the cost of making the repairs, whichever is the lesser. An automobile worth $100 might be so damaged in an accident as to require $500 to put it in the condition it was before the accident. On the other hand, a car worth $1,000 might be worth $100 after the accident, but could be restored for the expenditure of $300. The illustrations fit the case of damaged buildings. In the instant case the plaintiff made effort after effort to obtain answers to certain hypothetical questions but was unsuccessful over objections. The objections were largely based on the ground that the questions did not include all the elements or were not in accord with the evidence or that the witness was not competent. Objecting counsel did not point out wherein the questions did not include or properly reflect the evidence, nor did the court require him to do so even when he so offered. It would profit little in comparison to the space required to go over these many questions and

analyze them. The several we shall consider will be for guidance on the retrial and will represent the various categories.

Assignments Nos. 24, 25, and 26 treat of questions put to the witness Richards designed to obtain his opinion as an expert on the difference between the value of the Stevens building before and after demolishing the partition wall. The question, instead of describing the condition of the building before and after removal of the partition wall, included many of the building operations which plaintiff claimed caused the damage. This was unnecessary, but being simply redundant did not make the question incompetent. The questions also included the element of depriving plaintiff of a tie-in to the east and west walls of the old bank building. We do not think plaintiff entitled to such support. Therefore, this was an improper element in the question. By not assigning causes for the cracks and sagging, plaintiff could have avoided the objection that it was including conclusions not justified by the evidence, but since these causes were in accordance with plaintiff's theory of his case the question should not have been rejected on that account. In regard to the inclusion of the assumption that the angle irons did not render adequate support or that they were less firm or rigid than the old support, plaintiff had introduced the testimony of Woods as to the manner of construction but the testimony of Ketchum had not yet been given. Therefore, there was no foundation for such part of the question. The question was properly rejected, although the court would have done well in all these questions to require defendant's counsel to specify. Since the question with the addition and changes still had these objectionable elements, assignment No. 25 is not well taken. The witness was asked his opinion as to the market value of the Stevens building used in connection with the land in 1927 without stating its condition in 1927. It may have been assumed that the witness knew its condition from the hypothetical questions. Objection was made that the witness was not qualified and that it was not the proper

measure of damages. The objection was sustained. The court had previously said that he had not sustained objections on the ground of the witnesses' incompetency, so it was not on this ground that it was sustained. The difference between the values before and after demolition of the wall being most material to the question of damages and the value in 1927 or after the new bank was erected being one leg of that difference, this was one way to get at it. Moreover, the court permitted the witness later to give the market value of land and building as a unit before and after the demolition, so it must have recognized the witness' competency. Later all that was stricken. Assignment No. 27 specifies the striking as error. It appeared on cross-examination that the witness, while in the real estate business in Salt Lake City, had a few transactions in houses in Ogden, but could not say the year; that he handled no business property in Ogden; that all his information regarding sales and values was recently obtained from others; that he learned the net income from the property and by a formula capitalized it; that he was informed of only one definite offer for the property made in 1926 by Eccles. The matter of determining the qualification of a witness to testify as to value rests largely in the discretion of the court. *City of Geneseo* v. *Schultz*, 257 Ill. 273, 100 N. E. 926. The discretion exercised will not be disturbed except for palpable error. The witness is asked, not for his knowledge of transactions involving the property, but for his opinion, which involves a judgment which may be the result of a number of factors including knowledge of transactions. The witness must not be a mere transmitter of information. Any of us can do that. He must be able to give a judgment based on knowledge of values generally in that vicinity or with the sales transactions of the particular property under question. In other words, he must live in the atmosphere of transactions involving the sale and purchase of that real estate or similarly located property and have absorbed and made part of him that knowledge and experience. It may not be his ex-

perience but the experience of others. He may not be a real estate dealer provided he has absorbed the knowledge which gives him the basis of a judgment. *Geohegan* v. *Union Elevated R. Co.*, 266 Ill. 482, 107 N. E. 786, Ann. Cas. 1916B, 762; *City of Geneseo* v. *Schultz, supra.* It is not necessary that he dealt in land in the immediate vicinity if he has dealt in land in the general vicinity. *Hall* v. *Kansas City, etc., R. Co.*, 89 Kan. 70, 130 P. 664. It is not necessary that he be an expert if he have the sufficient acquaintanceship with the land in the vicinity which enables him to judge. *City of Geneseo* v. *Schultz, supra; City of Lafayette* v. *Nagle,* 113 Ind. 425, 15 N. E. 1; *Pennsylvania & N. Y. R. & Canal Co.* v. *Bunnell,* 81 Pa. 414. An opinion founded upon a knowledge of the location, productiveness, or the market value of land in the vicinity is competent. *Central Pac. R. Co.* v. *Pearson,* 35 Cal. 247. A person who has personally examined real property, and made inquiry of qualified persons as to its value, is competent to testify as to its value, though he does not live in the city where it is located. *Jones* v. *Snyder,* 117 Ind. 229, 20 N. E. 140. But this opinion must be as to present value. A witness not a real estate expert, who states that he knew the value of property generally in and about the city, but did not know the value of the piece in controversy until a year after the period at which its value was in question, is not a competent witness upon the question of value. *Burke* v. *Beveridge,* 15 Minn. 205 (Gil. 160). Richards was not called as one having particular knowledge of the value of the property in question because of his general knowledge of the value of property in the vicinity, but as an expert; that is, one who could estimate, from his training in the art of appraising, the present value of real estate if given certain bases such as location, use, possibilities, net and gross income, general facts about the growth, development, and present commercial and industrial condition and future possibilities, etc. He could make an estimate of the present value from such data with his experience and training as an expert applied to it. We see no reason why he

could not also as an expert do so for a time in the past. It appears that Richards attempted to do the latter. His opinion, therefore, was theoretically not properly stricken on the grounds of incompetency. The court, however, has discretion in the general matter of determining whether the witness was actually testifying as an expert or purely parading as an expert transmitting opinions of others. In judging that Richards was doing the latter, the court was within its right in striking the evidence. Consequently, assignments Nos. 26 and 27 show no error.

By assignments Nos. 28, 29, 30, and 31, appellant seeks to test out the ruling of the court refusing to permit De Puy to answer a long hypothetical question modified upon each refusal. This question sought to find the difference between the value of the whole property—real estate and improvements—before and after the new bank was built. It included the element of soil invasion, encroachments below the surface, wall and lintel and roof encroachments above, obstruction of cellarway, curtailment of window display space, injury to walls and floors of building, abolition of flues. It specified angle iron support for joists instead of the old brick wall, but did not, as in the Richards question, specify that the new supports were less firm or rigid. While it would have been better, as stated above, in this case to separate the damage to the vacant portion of the ground, in fact the whole of the ground, from the damage to the building, we see no objection to this question. It would have been an aid to the court as a check-up. Rules relating to the measure of damages in cases like this are not so rigid as not to permit of modifications to suit the situation. That rule which will most accurately attain the amount of damage is the more correct rule. Treating the whole property as a unit would have been an aid. The question was longer than necessary because it included causes as well as conditions, but some of those might have been necessary to give a proper conception of conditions. At least they are merely redundant. It was suggested by counsel for defen-

dant in his objection that there was no evidence that the sheet piling had not all been removed. Soderberg had so testified and plaintiff was entitled to base the question upon its theory. Moreover, that was a detail. We see no conclusions of fact in the question which did not accord with plaintiff's theory, although it might, as suggested, have been wiser not to include the conclusion that the building sagged because the 3/4-inch wooden wedges between the I beam and pier (referred to in the facts) had crushed. It would have been sufficient to state only the condition of the sagging as it was found after the demolition of the division wall. The court finally, after argument, retreated to the ground of lack of competency of the witness to sustain the ruling. The witness, a husband of one of the owners (through the plaintiff corporation), made a thorough examination of the property in 1924 for the purpose of arriving at a value at that time. He arrived at a conclusion as to the value at that time from his studies. In 1927 he again made a thorough examination of the property. He was familiar with prices in 1924, and states that during his absence from Ogden in 1925 and 1926 he kept in touch with the values. Unless there was something which changed the values substantially between 1924 and 1926, he would be competent to testify to the value in 1926. He was in a way interested in the property, for his wife was interested. There was sufficient reason to suppose he would become and continue to familiarize himself with the values of a valuable piece of property his wife was interested in. This fact, coupled with the facts that he made a personal physical examination of the building in 1924 and again in 1927, makes him competent. Relative familiarity, knowledge, and judgment affect the weight to be given the testimony. The questions refused under assignments Nos. 29, 30, and 31 were but different ways of endeavoring to aid the court in arriving at the value when other attempts had failed. All of them were pertinent. It was error to refuse them.

The plaintiff attempted to ascertain what the rental value of the dance floor would have been in 1928 and 1929 if it had not been unleveled. It was not error to reject this question (assignment No. 32). The damage was included in the difference between the market values. A witness testifying as to value may take into consideration the rental income and may be cross-examined as to whether he bases his opinion on rental value, but in itself it is not material.

But as to whether it was safe to use the floor for dancing or a skating rink, it is doubtful whether he was competent to answer this question. It does not appear that he was a builder, contractor, engineer, architect, or otherwise trained to give an opinion on this matter. Unless it was so apparent as to be determined by observation, he was not competent. The question itself was material.

Griffith was asked a hypothetical question in all respects except the ending such as was put to De Puy. The ending does not include the element of disregarding any increase in value which may have attached because of the new bank building. It also, as in the questions put to Richards and De Puy, includes the matter of breaking the tiein given by the formerly continued east and west walls of the old unit building, somewhat implying that this was an element which could be recovered for. That is one of the results of detailing the causes and operations too minutely. The question was near enough correct not to be rejected. The modified question, the rejection of which is attacked by assignment No. 45, ends by asking the witness to give his judgment as to the "depreciation suffered in the Stevens property in 1927." It assumes there was a depreciation which, while not a violent assumption, was better covered by the former question.

The witness Woods was asked what it would cost to make certain repairs and replacements which he had already mentioned as being necessary to put the building in the condition

it was before the demolition. The same question was asked as to the cost of leveling the floors. It was objected to that it did not appear that they were level before the demolition. By what we have heretofore said regarding the two avenues of approach in determining damages in a case like this, they were improperly refused, and assignments Nos. 34 and 35 are therefore well taken. The longer question asked Mr. Woods as to the "cost of a structure" to raise the floors and floor joists to as nearly the original level as possible was proper under plaintiff's theory, the witness testifying that columns to support them were necessary. If the defendant, as it did on cross-examination, desired to show that shims placed between the floor and joists would cost less, it had that privilege (assignment No. 36). The refusal to permit the witness to testify as to the cost of leveling floors without raising the joists was error (assignment No. 40). Similar questions were rejected and the rulings assigned as errors under assignments Nos. 37, 38, and 39. The assignments were well taken. Woods was asked the hypothetical question as to the additional cost of excavating for a three-story building because of the necessity of obtaining a secure foundation by reason of the invasion of the soil by defendant, on the assumption that it would be because of said disturbance necessary to go to the depth to which the bank had excavated defendant's soil. The question was substantially correct except that the $3\frac{1}{2}$-inch mat did not go along the entire south side of defendant's lot. The assumption was that plaintiff would have to go to the full depth for solid footings. Unfortunately there was no testimony to support this assumption. Plaintiff endeavored to ascertain from Woods his opinion whether it would be safe to build a three-story structure on the lot without excavating to the full depth to which the bank had disturbed the soil, but the court refused to permit the question and the ruling was not assigned as error. Counsel attempted again and again in one form or another to obtain from the witness an opinion as to the extra cost of excavation greater

than the 10-foot depth which it was assumed would only have been required had the soil not been disturbed; but all the questions were rejected. While this was not the measure of damages, such figures given by both sides might have been helpful for the court to check up. And if it actually appeared that the extra cost of excavation was less than the difference in the value of the lot before and after excavation, that would be the measure of damages; but such was unlikely and would have had to appear quite conclusively. Assuming that the court had properly ruled on the tendered evidence of requirement to excavate to the full depth for safety reasons, all these other questions would have been proper although not necessary, and their refusal not prejudicial. Assignments Nos. 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 41, and 42 were well taken.

The witness Soderberg was asked the market value of the whole property—real estate and improvements—after alleged injuries. He gave it, but on cross-examination it was stricken. The witness was in charge of the property from 1918 to 1927; he married one of the sisters interested in the property. He showed sufficient knowledge of the value before operations to make his testimony competent, but it appeared that his opinion of the depreciated lot and building was based on a single offer. It was not shown that he had any knowledge of the cost of repairing the building or of excavating, or that his opinion was the resultant of the various factors which should form the basis of an opinion. The value of the depreciated building and ground really dealt with a special subject different from an ordinary building and lot. The criteria which would govern their value would not be those customarily applicable to the ordinary lot and building. If the knowledge were based on genuine offers which could be shown to have been made by persons whose knowledge and judgment regarding the effect of the infirmities was reliable and therefore probably affected the amount of the offer, the opinion might have been admissible. But it was based on only one offer. It was not

knowledge of value nor an expert opinion, but a mere inference from a single offer. No discretion was abused in striking it. Therefore assignment No. 47 is not well taken.

We have set out the general principles governing the measure of damages and the competency of witnesses and discussed sufficient of the hypothetical and other questions to serve as a guide in the next trial. We shall now pass on to the next question: Knowledge, acquiescence, consent, and estoppel. Plaintiff complains of various findings wherein the court sometimes finds knowledge; at other times knowledge and consent; at others that plaintiff had knowledge but made no objection; at others that plaintiff agreed or acquiesced in the operations or methods of defendant. We shall group these allusions in the findings in reference to the particular operation or method in regard to which knowledge, consent, acquiescence, or agreement is found. In regard to the shoring or method of temporary support, finding VI states that the defendant "by the *consent* express or implied of plaintiff" erected temporary supports for the joists, beams and structures and excavated to a considerable depth and drove in pipes filled with concrete lagging and other structures for the purpose of supporting the said building above and below the original foundation thereof. In finding VIII it is stated that plaintiff *was*

"*informed* and *knew* of the necessity of removing said wall and of the means necessary which were subsequently used to protect said building both during the construction of said building and thereafter, and of the means necessary in order to enable defendant to construct its said building, and *consented to* and *acquiesced* in the removal of said building and the south wall thereof and *made no objection to the means proposed to* protect the plaintiff's building either during construction or after completion."

The plaintiff is a corporation. It could only know or consent through its officers or agents. Knowledge and consent are different things. One can know without consenting; one can hardly consent without knowing. Furthermore, a cor-

poration may be charged with knowledge, if certain of its agents have knowledge, but in order to bind it by consent it must be shown that such agent had the authority, express, implied, or apparent, to consent or agree. Soderberg was the agent to collect rents and manage the building. Knowledge by him of what was intended and what transpired to plaintiff's building was knowledge of the corporation. He was there for the purpose of managing, protecting, and caring for it. In regard to anything which physically affected the building or would do so, it was his duty to notify his principal. When he knew of those things his principal knew of them. If a person told this agent in charge that he intended to take possession of the building and did so, it was knowledge to the principal. This is the type of agent who is placed by the principal to obtain or to which such information is to be imported. But granted the plaintiff had knowledge of the means which were to be used to support its building, can it be said that it has knowledge of the effect such means will produce. It is not charged with expert knowledge or the knowledge that not even defendant appeared to have, that is, that the building would sag. It must be presumed that not even defendant's contractor knew the shoring would not prevent sagging. How then would plaintiff know it? It had the right to rely on the method being adequate. The plaintiff, of course, knew of the intention to remove defendant's building and the division wall. From what we have said above, defendant had the right to remove it. Objection was futile. Failing to object, therefore, in no way committed plaintiff. We find no evidence to support the finding that plaintiff consented, expressly or impliedly, to the excavation beneath plaintiff's building or at least to the results of such excavation or to the placing of any piles or lagging or concrete thereunder. It had knowledge but did not consent to it or to the damage done by it. It may not have protested, and this might influence the chancellor rightly not to use his injunctive powers, but that plaintiff

is estopped to claim damages is not tenable. Assignments Nos. 71 and 76 are therefore well taken.

What has been said above applies to the part of finding VIII which states that plaintiff had knowledge of the plans for removal but made no objection. It was not required to object, and if it knew that something was going to be harmful to its property, failure to speak would not be a tacit consent to that harm, but would work a denial of the remedy of injunction. The same is true of the part of finding XVI wherein it is set out that plaintiff had knowledge of the construction of the retaining wall (8-inch false wall) and permitted defendant to go on its land to construct the same, and that the same was constructed with the "knowledge, acquiescence and consent" of plaintiff. Defendant had the right to go on plaintiff's land to do the things necessary to protect plaintiff and to remove the division wall. In so doing, it was not a trespasser. The fact that Soderberg gave the contractor the keys to plaintiff's building (which he denies) or permitted him to store certain material there was a co-operation in the exercise of that right. An accommodation or co-operation in facilitating the duty of defendant to protect plaintiff's property cannot be converted into a consent to injury. When defendant removed the foundation wall and put up the concrete wall at a *considerably lower depth,* it was not in place of the foundation wall, but for its own purposes to keep out the moisture. Whether this concrete wall has really damaged the plaintiff must be determined from those witnesses who are able to tell whether it would make future building more difficult according to the principles above enumerated. Assignment No. 89 is therefore well taken.

In finding XVII the court found that plaintiff knew where the lines according to which the walls were to be built were located, "and made no objection to the location of any portion of any of the walls of said building until the same had been completed, but on the contrary acquiesced in said location." Such finding cannot be sustained according to the

above principles. Plaintiff may have known but was not precluded except as to injunctive relief perhaps, but that it acquiesced there is no evidence.

In finding XIX the court found that "defendant did, in lieu of building a new wall for the support of the roof and floor joists of plaintiff's old building, with knowledge, *consent* and *acquiescence* of plaintiff, cut off the said joists flush with the new south wall of said new building and provided supports for said joists consisting of angle irons," etc. Piers showed Judge A. E. Pratt and Soderberg the plans for the building before any operations were started. They called for a 12-inch wall to support the Stevens building on the Stevens property. After a few days, Piers was informed that they did not wish to have the 12-inch wall because it would take a foot off the Stevens property. Piers explained that the new wall would be only 5 inches thick and would not permit of the joists being inserted "so that matter about the joists was just left open at that particular time." Later in the winter of 1926 (on cross-examination placed in the summer of 1927) he testified he talked to Soderberg, Judge A. E. Pratt, and Woods. He says Woods suggested that angle irons might be used. He said he would go and figure out what sized angle irons and bolts should be used. He never recalled having another conversation regarding the angle irons and bolts. The plans concerning these details were given to Whitmeyer, the contractor, to go ahead with. Both Soderberg and Woods denied that Woods suggested angle irons. Woods stated that when he found they were to be used he made objection. It appears affirmatively that Woods was employed by plaintiff to look after the matter of advising and protecting their interests as they might be affected by defendant's building operations. It also appears affirmatively that Woods was never consulted concerning the size of angle irons and bolts. The evidence in this regard shows Woods may have had knowledge that they were to be used and this knowledge would be plaintiff's knowledge, but there is no evidence that

consent and acquiescence in the use of the particular sized angle irons and bolts was given. The consent urged to the utmost could only go as far as a suggestion, and whether such mere suggestion made in the course of a conversation between friendly architects could bind plaintiff it is unnecessary to decide, because there certainly was no consent by plaintiff to the particular kind of construction or the use of the size of angle irons and bolts actually placed in the wall. Such details would mean everything in an attempt to infer a consent, not only to the manner of support, but to the adequacy of support. Assignment No. 92 is therefore well taken in respect to the finding of consent.

We next come to the matter of the pier which was constructed to support the I beam at the northwest corner of the Stevens building (see statement of facts). Finding VI states, "and said pier and pillars was constructed upon the plaintiff's property with the knowledge and *consent* of plaintiff." Finding XVIII states that, "and thereupon defendant proposed to plaintiff that instead of such means being employed defendant would construct a concrete and brick pier for the support of said beam, which proposal *was accepted and agreed to by plaintiff*," and that plans were submitted to and approved by plaintiff and the construction was done *"in accordance with such plans* and with the knowledge, *consent* and acquiescence of plaintiff." (Italics supplied.) Finding XX again refers to the agreement between plaintiff and defendant as to the construction of the pier. This case needs special treatment because Eccles, for the defendant, and Soderberg, ostensibly for the plaintiff, signed Exhibit 5, which was a plan of the pier. Piers testified that he told Soderberg that the division wall was already three-fourths demolished and that the I beam would need support; they went to Judge Pratt's office. A drawing of the proposed brick and cement pier was delivered to Soderberg, who said he did not have authority to sign it but that he would take it home to his wife to look over and sign (Mrs. Soderberg was secretary and a director of plain-

tiff). Piers went next day to Soderberg, who called his wife on the phone. She said the drawing had gotten badly torn by the children. Piers furnished another (Exhibit 5). He took it to Soderberg's office. Mrs. Soderberg was there and Soderberg signed it as representing the plaintiff. Soderberg says Piers spoke to his wife when he was not present and that he was at the lunch counter when he signed Exhibit 5 and Mrs. Soderberg was not present. Whether plaintiff consented depends on whether Soderberg was its agent to approve the plan of erecting the pillar, or whether Mrs. Soderberg had authority and he represented her in the matter as a subagent. Soderberg was an agent to collect rents, make reports to the officers, and manager of the building. Such authority did not include nor imply nor hold out apparent power to act for plaintiff in the important matter of permitting its property to be occupied by a pillar nor change the very supports of the building. In the case of *Evans* v. *Shephard,* 81 Ind. App. 147, 142 N. E. 730, the identical question was involved of whether a manager of a building was authorized to agree to give another an interest in a division wall. It was held he was not. Nor was the secretary of the plaintiff so authorized. It was not in the ordinary and usual scope of the duties of a secretary. One engaged to keep minutes, do clerical work, and the other secretarial duties of a company is not authorized to concede valuable property rights or agree to structual changes in a building which forms the main or only asset of the corporation, and which asset it was organized to hold for the benefit of several who would otherwise own it in common. The defendant may have been materially misled, but that cannot affect the rights of the corporation. Nor is there any evidence of a ratification by the corporation. Moreover, in any case no consent to use wooden wedges was involved or shown in the plan and it was claimed the crushing of these caused much of the sagging. Consent at the utmost would be only to the known results; that is, obstruction of entry way and window space. But we find knowledge but no consent. Thus, it re-

sults that assignments Nos. 73, 74, 91, and 94, striking at the above findings, were well taken.

Since Soderberg's authority to sign Exhibit 5 was not shown, the court should have sustained the objections to the questions contained in assignments Nos. 52, 53, 54, 55, and 57, or permitted the answers tentatively pending a proper connecting up. This was never done. Assignments Nos. 56 and 58 are trivial. In the course of attempting to rebut this evidence of Piers and Whitmeyer, plaintiff sought to elicit certain testimony from Soderberg and Woods. Laying aside the form of the questions and trivial imperfections, the answers generally should have been allowed. These rulings are attacked in assignments Nos. 61, 62, 64, 65, 66, 67, and 69. They were well taken. The refusal to permit testimony endeavoring to negate authorization from the officers of the plaintiff to permit defendant to go on the Stevens property, referred to in assignment No. 63, may be perhaps on highly technical grounds correct. Plaintiff was not required to negative authority until it was proved.

Was the plaintiff entitled to a mandatory injunction as to subsurface encroachments? These encroachments as found by the court did no harm. They were completely out of plaintiff's way and could not possibly interfere with the enjoyment of its property unless deeper excavation was necessary. When that was required, plaintiff would have been compensated for their removal by the damage due to the depreciation, if any, in its lot by reason of such encroachments. The basis of a mandatory injunction for the removal of encroachments is nuisance or the likelihood of ripening into an easement. *Rankin* v. *Charless*, 19 Mo. 490, 61 Am. Dec. 574; *Marcus* v. *Brody*, 254 Mass. 152, 149 N. E. 673. These encroachments were not a nuisance. They constituted a trespass only. Since defendant fully occupied its property, ejectment could not lie. See *Rahn* v. *Milwaukee Light Co.*, 103 Wis. 467, 79 N. W. 747. (Other cases have, however, held differently. See Tiffany on Real

Property [2d Ed.] Vol. 1, p. 865.) They do not interfere with plaintiff's enjoyment of its property. *Trulock* v. *Parse*, 83 Ark. 149, 103 S. W. 166, 11 L. R. A. (N. S.) 924; *Harrington* v. *McCarthy*, 169 Mass. 492, 48 N. E. 278, 61 Am. St. Rep. 298. We do not mean to hold that in certain cases a party might not be compelled to remove subsurface encroachments into the land of another, where they were knowingly made without regard to the other's rights and purely for the benefit of the party encroaching, and where it could be shown that they were a detriment to the use of the other's land and there was no laches or delay in asking for the remedy. Every case must stand on its own facts. *Rahn* v. *Milwaukee Elec. Ry. & L. Co.*, 103 Wis. 467, 79 N. W. 747. In this case, however, there is no curtailment to the use of plaintiff's premises. The mats and walls were not in officious, aggressive, or ruthless disregard of plaintiff's rights, but necessary for defendant's structure and removable when plaintiff desires to excavate. Defendant is willing to pay the decrease in value to the land which their presence may occasion, or, if not, can be required to do so. They do not protrude much beyond the lower part of the old stone wall. A portion of the structure has some office in supporting the soil under plaintiff's building. And while the plaintiff did by letter on April 6th notify the defendant that it was over the line, no application for an injunction was made until the whole building was up. See *Lewis* v. *Pingree Nat. Bank*, 47 Utah 35, 151 P. 558, 563, L. R. A. 1916C, 1260. The cost of removing them would be tremendous as compared to the almost negligible benefit such removal would be to plaintiff. The court was correct in denying the application for the injunction to remove these encroachments, but wrong in assessing the damage on the front-foot basis on the theory that there was a taking of property. The measure of damage is as above set out. Assignment No. 86 and respondent's assignment No. 6, both attacking this method of assessing damages, were well taken. The court was correct in finding XIV that the mat did not interfere with plaintiff's present

enjoyment of its property. Assignment No. 85 is therefore not well taken.

A more difficult situation is presented by the intrusions above the ground—the cornice, lintels, and irregularities in the south wall. We find no laches, delay, or estoppel. Plaintiff warned defendant by letter of April 30, 1926, when defendant was pouring cement for the 8-inch ■■■■ wall, that the latter was encroaching on its property. While as to those encroachments it did delay in suing for an injunction, as to the encroachments of cornice, walls, or lintels, that could not be discovered until the walls were up. Moreover, there can be no estoppel when both parties are equally ignorant or in equal knowledge that one is on the other's ground, and certainly not when he who is encroached upon is ignorant and the other informed. *Mulrein* v. *Weisbecker*, 37 App. Div. 545, 56 N. Y. S. 240; *Bright* v. *Allan*, supra. The neighbor owes no duty to investigate to determine whether the adjoining owner is trespassing. *Crosby* v. *Blomerth*, 258 Mass. 221, 154 N. E. 763. Mere failure to object when the other must have equally known of the trespass or both were ignorant does not raise an estoppel. *Finch* v. *Theiss*, 267 Ill. 65, 107 N. E. 898. It usually requires some affirmative act or silence where there is a duty to speak to raise an estoppel. Nor is there any element of laches. Laches is usually not mere delay, but standing by watching one change his position or delay for such length of time that it amounts to an acquiescence.

We find therefore, neither laches nor estoppel. Is it a nuisance? It is not presently a nuisance, in that it does not now cause annoyance, inconvenience, or discomfort to the plaintiff. *Rankin* v. *Charless*, supra; Bouvier's Dict. (Baldwin's Cent. Ed.) 861. Tiffany on Real Property, vol. 1, p. 864, states that, "Such an encroachment upon ■■■ the space above one's land has been regarded as a nuisance," citing cases. But examination of all the cases cited shows that the overhanging tree, or eaves, or other object by dripping rain or impeding the use of plaintiff's

premises actually caused annoyance and was a nuisance in fact. Baten's Case, 9 Coke, 53f, implied a nuisance where defendant's house overhung plaintiff's house because of necessity the rain must drip down. *Fay* v. *Prentice,* 1 C. B. 828, followed this case. In *Meyer* v. *Metzler,* 51 Cal. 142, it was found that it interfered with the raising and repair of plaintiff's building, "which improvement he was desirous of making." In *Norwalk Heating, etc., Co.* v. *Vernam,* 75 Conn. 662, 55 A. 168, 96 Am. St. Rep. 246, it was found that plaintiff desired to build on its premises and the projection prevented it from doing so. In *Wilmarth* v. *Woodcock,* 58 Mich. 482, 25 N. W. 475, the cornice projected from 6 to 16 inches over the line and actually was an annoyance. There is no evidence in this case that the cornice or lintels or bulges in the wall in any way inconvenienced or annoyed plaintiff or lessened or interfered with the enjoyment of its property. The elements of nuisance are not present unless constructively so. It may become such if plaintiff builds strictly to the line and higher than its present building. *Barnes* v. *Barendes,* 139 Cal. 32, 69 P. 491, 72 P. 406. But it is an injury entitling the party to redress if it does damage. Ejectment cannot reach it because the encroachment over his line is above the ground. Such action would be fruitless because no judgment could put him in possession of his property above the ground and an order to the sheriff to remove the encroachments would be impracticable. The encroachments might, if plaintiff desires to build a taller building, become a nuisance or ripen into an easement. This states the case for the plaintiff. The intrusion by the defendant may have been unintentional in the sense that it thought the $2\frac{1}{8}$ inches which plaintiff's lot measured from over 50 feet from its south wall belonged to it if it was sincere in its belief that the present monument was wrongly placed. We have some difficulty in accepting this view, because it actually laid its wires according to its supposed boundaries and built its concrete south wall flush with the south wire. It must have known, therefore, that the lintels would protrude. But

irregularities in the wall to the extent of from fractions of an inch might well occur without anticipation. They ran from .48 to 2.04 inches on the east and south sides. But the intrusion was not willful or hostile as in the case of *Kershishian* v. *Johnson*, 210 Mass. 135, 96 N. E. 56, 36 L. R. A. (N. S.) 402. No evidence of the cost of removing the lintels or protuberances or cornice was given. It may be that with a 5-inch wall these extensions could not be ground off, or they may be so extensive in their areas as to make that impracticable, so that in order to remove them the whole wall might have to be removed. Under modern construction, where the structural steel is all tied in, this might well mean the demolition of the entire building.

Plaintiff claims it has an absolute right to an injunction where there is no laches and a clear case of trespass. This is not correct. "The court will always consider the equities between the parties and under some circumstances, a court of equity will" balance convenience and injuries, and even under some circumstances deny equitable relief because a great injury will be done to the defendant by a mandatory injunction with little or no benefit to the complainant. *Haitsch* v. *Duffy*, 10 Del. Ch. 280, 92 A. 249; *Pradelt* v. *Lewis*, 297 Ill. 374, 130 N. E. 785, 14 A. L. R. 828. Where the occupation does no damage to plaintiff except the mere occupancy of a comparatively insignificant part of its messuage, or the buildings are not obnoxious by reason of their use, or do not interfere with the value or use of the rest of plaintiff's land, the injunction will not be granted. *Methodist Episcopal Soc.* v. *Akers*, 167 Mass. 560, 46 N. E. 381. In *Crocker* v. *Manhattan Life Ins. Co.*, 61 App. Div. 226, 70 N. Y. S. 492, 497, the facts were quite similar to those in the instant case. The cornices, iron shutters, and wall of defendant's tall building overhung plaintiff's premises from $1\frac{1}{8}$ to $4\frac{3}{4}$ inches. The testimony varied from $50,000 to $250,000 to remove the wall. Plaintiff claimed it had an absolute right to have it removed. The court said:

"There is, therefore, no reason why equity may not consider, in the present case, the hardship upon the one side and the corresponding lack of benefit upon the other."

Damages for permanent injury were awarded on the theory that both parties had submitted the complete adjustment of their case to the court. *Stowers* v. *Gilbert* (1898) 156 N. Y. 600, 51 N. E. 282, and *Ackerman* v. *True*, 56 App. Div. 54, 66 N. Y. S. 6, were distinguished on the question of the right to award damages. In the instant case there can be no question of the court's right to award damages where the equitable relief is denied because plaintiff and defendant alike submitted the case on the theory that the court might find the damages, if any, in case equitable relief were denied.

Even those jurisdictions which most severely apply the doctrine that plaintiff had the right to repel what would amount to a condemnation if a mandatory injunction were not issued, recognized the principle that there may be circumstances which in equity would be persuasive of the withholding of the injunction. *Starkie* v. *Richmond*, 155 Mass. 188, 29 N. E. 770; *Szathmary* v. *Boston & A. R. Co.*, 214 Mass. 42, 100 N. E. 1107; *Lynch* v. *Union Institution for Savings*, 159 Mass. 306, 34 N. E. 364, 20 L. R. A. 842; *Norton* v. *Elwert*, 29 Or. 583, 41 P. 926; *Ackerman* v. *True*, supra; *Pile* v. *Pedrick*, 167 Pa. 296, 31 A. 646, 647, 46 Am. St. Rep. 677; *Glinn* v. *Silver*, 64 Pa. Super. 383; *Marcus* v. *Brody*, supra; *Levi* v. *Worcester Consol. St. R. Co.*, 193 Mass. 116, 78 N. E. 853. In the cases of *Crosby* v. *Blomerth*, supra, and *Mayor* v. *Flynn*, 46 Utah 598, 150 P. 962, the cost of removing the intrusions was very small compared to the cost involved in removing defendant's structure in this case, and in those cases if the structure remained it would have been an actual nuisance and an inconvenience to the plaintiff. Likewise in *Ackerman* v. *True*, supra, if the encroachment remained it obstructed the plaintiff's right of way and materially decreased the enjoyment of its property. Where the intrusion really lessens the actual enjoyment of

plaintiff's property by causing inconvenience, annoyance, or limited use of his property, he will not be required to accept damages and continue to suffer the condition so that the defendant may still continue the use of the property it has appropriated, unless perhaps the disparity between cost of removal and the inconvenience to plaintiff is very great. See *Mulrein* v. *Weisbecker*, and *Marcus* v. *Brody*, supra. In our own case of *Lewis* v. *Pingree Nat. Bank*, supra, this court recognized the "balance of injury" theory as designated by Pomeroy (5 Pomeroy, Eq. Jr. § 508). True, in that case the court held that the plaintiff might have sooner brought the action, the encroachment being apparent from the beginning of erection of the bank front. But it rests primarily on the balance of injury theory; that where the cost of removal would be disproportionate and oppressive compared to the benefits derived from it by plaintiff and where plaintiff can be compensated, the court will not compel the removal. *Levi* v. *Worcester Consol. St. Railway Co.*, supra; *Rothaermel* v. *Amerige*, 55 Cal. App. 273, 203 P. 833; *Starkie* v. *Richmond*, supra; *Coombs* v. *Lenox Realty Co.*, 111 Me. 178, 88 A. 477, 47 L. R. A. (N. S.) 1085.

We find the court committed no error when it refused the mandatory injunction. Indeed, counsel for plaintiff, anticipating that the court had the right to refuse to exercise its injunctive powers, frankly stated that he included these encroachments in his hypothetical questions for that reason.

From the principles herein laid down, most of the assignments not specifically considered may be resolved. Some of them, however, pertain to questions of the admissibility and rejection of evidence not above considered. In a general way, and subject to what has been said above, without refined analysis and disregarding form or trivial matters, the assignments may be catalogued as follows: Well taken: Nos. 1, 2, and 3 (state of mind not material); No. 4 (except tentatively); No. 5 (while not covered in complaint, showed general effect on the Stevens building); Nos. 6 and 7 (can-

not delegate responsibility to independent contractor and latter's admissions as to physical facts evidence against defendant) ; Nos. 8 to 23, inclusive, 26 to 31, inclusive, 34 to 41, inclusive (42 and 43 as aids), 44 to 46 and 49 to 55, inclusive, 57, 59, 61, 62, 63 (double question—calls for a conclusion), 64 to 75, inclusive (the latter as to agreement in reference to angle irons), 76, 78, 80 (no evidence to support), 81, 83, 84, 86 (except as to fronts or lines theory of damages incorrect), 87, 88, 89, 90 (because of finding of acquiescence), 91, 92, 94, 96, 97, 99, (101 to 104, inclusive, should all be encompassed in 105), 107, 108. Respondent's assignments Nos. 1 and 2 (on ground of improper mode of assessing damages), 3 (but not on ground mentioned). Not well taken: Nos. 24, 25, 32, 33, 47, 48 (to show knowledge), 56, 58, 60, 77, 79, 82, 85, 93 (conflict of evidence), 95 (conflict in evidence), 98 (conflict in evidence), 100 (conflict in evidence), 106. Question assigned as error in No. 60 was abandoned. Respondent's assignments Nos. 4, 5, and 6.

The judgment is reversed, with directions to grant a new trial in accordance with the principles herein announced. Costs to appellant.

ELIAS HANSEN, C. J., FOLLAND and EPHRAIM HANSON, JJ., and H. M. SCHILLER, District Judge, concur.

MOFFAT, J., being disqualified, did not participate herein.