BEN BELL, APPELLANT, v. JOHN W. WAGNER, RESPONDENT.—178 S. W. (2d) 813.

Kansas City Court of Appeals.   January 31, 1944.

*Charno & Drummond* and *John A. McGuire* for appellant.

154

*Henry L. Jost* and *Reinhardt & Schibsby* for respondent.

BLAND, J.—This is an action for damages to a stock of paint, wall paper, window shades, and to plaintiff's business, caused by the falling of a wall owned by the defendant, upon the building in which the stock of goods was located. At the conclusion of plaintiff's testimony the court marked "Given" defendant's instruction in the nature of a demurrer to the evidence, resulting in an involuntary nonsuit being taken by plaintiff, and in this appeal.

The facts show that defendant acquired, in the year of 1892, the real estate located at 1409 Grand Avenue, in Kansas City, consisting of a lot fronting twenty-five feet on Grand Avenue with a two story building thereon. The building extended across the front of the lot and was about sixty feet in depth but the lot extended farther toward the rear.

Plaintiff's stock of goods was located in an adjoining building to the south known as 1411 Grand Avenue. The record is indefinite as to whether this building was in existence at the time defendant acquired his building; but the record does show that it was either erected or rebuilt about the year 1900. There is no evidence tending to show that the south wall of defendant's building was used as a common wall in conjunction with any building to the south that may have been there prior to 1900. However, the undisputed evidence shows that it became a common wall for the two buildings when the building to the south was built or rebuilt about the year 1900, notwithstanding that there was no agreement entered into relative to it.

In 1892, when defendant acquired his building, he built a one story addition to the back, but not all the way to the rear end of the lot. However, in 1902 or 1903 the one story building was continued to the rear of the lot. The two additions are not involved in this case. In 1902 defendant's two story building was altered. At that time he was conducting an undertaking establishment therein and he erected a new ornamental front to his building and tore out the ceiling of the first floor and the roof of the second floor in order to create a dome chapel covering an area of 18 x 30 feet. There were no pillars placed in the chapel. The chapel adjoined the south wall of the building, there being a hallway to the north of the chapel. He did not ask the consent of the owner of the south building about this remodeling, but apparently no protest was made to defendant making these alterations. To accomplish the change in his building defendant built the south wall upward (the petition alleges for an additional ten feet) and placed four large ornamental windows along the wall near the top and erected a dome roof over the building. Witnesses estimated that defendant's south wall extended from ten to twenty feet above

the roof of the south building after the improvements were made. Defendant remained in his building for thirty-eight years after remodeling it. No repairs were made to his building after 1902 when the building was remodeled. In 1930 he moved and had tenants in his building, off and on, until 1934. Thereafter the property stood vacant. Defendant went there about every six months to have the place cleaned up.

Plaintiff leased the south building from the owner for a term beginning March 1, 1937, by a written lease, in which it was provided that he took the premises in their present condition and that he should keep same in repair.

On June 15th, 1937, the entire south wall of defendant's building, including the extension, fell down, with the exception of portions near the top and at the ends. The inside of the building to the south also went down. Defendant's building remained intact except as to the south wall.

It appears that the building to the south, or plaintiff's building, was two stories in height as far back as the rear of defendant's original building and from that point on it was a one-story building, the one story running but a short distance. The roof of the building was flat. There is no evidence as to whether the south wall of any part of defendant's building constituted a common wall with the one story part of plaintiff's building. No part of defendant's building, that he constructed to the rear of his original building, fell when the common wall aforementioned fell and the one-story part of plaintiff's building remained intact.

Witnesses estimated the size of plaintiff's store building as of twenty-five foot frontage and approximately seventy-five to 100 feet long. The first floor of plaintiff's building was divided by a partition located about ten feet from the back end of the store and about seven or eight feet high. The height of the first floor of plaintiff's store room was approximately twelve feet. The second floor and basement were not used by plaintiff although they were covered by his lease.

Plaintiff carried several hundred gallons of paint on the north side of his store room but the shelves were not attached to the wall. He also had a rack consisting of 100 wooden tills, each till built to carry a roll of wall paper weighing about thirty-five pounds. This rack was near the north wall and to the rear of the paint but was not attached to the wall.

Plaintiff's witness, White, testified that about six months before the wall fell, he was seeking a new location for his company, and was shown defendant's building by a real estate agent; that he went inside of the building and made an inspection; that the first floor was in "fairly good repair"; that the south wall of the second floor "had very little plaster on it, was badly water stained, had the appearance of leaking badly, moisture coming through the wall"; that he and the

agent went to the rear of defendant's building and he "noticed a belly" in the south wall of defendant's building that extended above the roof of plaintiff's building; that "this bulge was two or three inches out from a straight up and down plumb line"; that at the time of the collapse of the wall in question the witness' company occupied a building facing the street east of Grand Avenue and located across the alley to the rear of plaintiff's and defendant's buildings; that on that day he was in the rear part of his building when he heard a rumbling noise; that he ran to the dock, through the door which was open, and upon looking he saw a hole in defendant's extension wall running along the upper ten or fifteen feet of it and extending down to the roof of plaintiff's building; that he could not see below the roof of the latter building and could not say whether the hole extended below the roof of that building; that he saw brick dust and mortar dust going up into the air from the roof of plaintiff's building; that the roof and rear walls of plaintiff's building were intact; that "it seemed to be about a minute or so separating before the roof finally went in, of the lower building to the south of the taller building to the north, and then shortly after, say in about two or three minutes a flame seemed to break out in the wrecked structure to the south of the taller building"; that there was a hole in the wall of defendant's building and he saw brick and debris on the roof of the plaintiff's building; that he actually saw the roof of plaintiff's building collapse; that he was located about fifty or sixty feet back from plaintiff's building at the time he observed the condition above described; that after plaintiff's building collapsed the hole in defendant's building "was completely exposed."

He testified that he did not care to express an opinion as to whether the entire wall fell before the roof of plaintiff's building collapsed.

The witness, Godsey, testified that, during the spring or summer of 1935, he looked over defendant's building with the idea of renting space for his studio; that the first floor at that time "looked fairly good"; that the south wall on the second floor was "conceived in at least an inch, . . . covering a space of about five, six or seven feet, going up, . . . and it went most of the length of the room"; that this "bulged out" place covered five or six feet, "starting, I would say, around three or four feet from the floor on up, and on up, covering five or six feet, and the whole length of the wall side." On cross-examination, he stated that the bulge started two or three or maybe four feet from the floor and went on up five or six feet the whole length of the wall.

The witness, Cooper, testified that he was a clerk in plaintiff's store and, on the day that the wall in question fell, he was waiting upon a customer; that they were standing about ten feet from the front of the building and about midway, north and south, of the building;

that he heard a "crackling" noise; that he turned around and saw a crack in the north wall of plaintiff's building not over a foot from the ceiling; that the crack was approximately a third of the way back from the front; that, at the same time that he saw the crack, the "whole ceiling seemed to settle down"; that he told the customer "we had better get out of here"; that they both ran for the front door, which was open, and "as I went to the front door . . . just as I got to the door . . . the ceiling came down . . . The building right behind me caved in, the whole thing, . . . as I went to the door and it was like a gust of wind that pushed you right out in the street;" that he heard no noise and heard no explosion; that after the collapse of plaintiff's building "the roof seemed to slant to the south wall, slant up to the south, . . . The roof was still stuck into the wall on the south side."

The witness, Jackson, testified as an expert engineer. When asked a hypothetical question concerning a three-inch bulge, of the size and type involved in defendant's wall extension, he testified that such a condition "would indicate that there was some movement of that wall caused by some external force"; that the bulge could be caused by settlement of the foundation or by "stresses set up within the building itself; it might be caused by deterioration of the brick and mortar joints." There is no evidence of any settlement of the foundation. He was of the opinion that the cracks and water stains on the inside of the wall were an indication that water was getting through and this "would have a big bearing on the strength of the wall. . . . it is subject to freezing and thawing, and can cause disintegration of the wall itself"; that a wall with cracks and water stains having a bulge of two or three inches, are conditions which are "liable to induce a fall of the wall".

Photographs of the wrecked structures were shown the witness. These photographs show the entire common wall had fallen with the exception of the upper part of the extension wall. This upper part is a small segment of the wall and remains suspended. There also appears, at the end of the opening, caused by the fall of the wall, broken and irregular columns resulting from a tearing of the wall from the corner pillars. The witness testified that it appeared to him that the extended portion of defendant's wall had been constructed so as to be three bricks thick; that this part of the wall rested upon a wall of one or two bricks thick; that this, in his opinion, "is not the best construction, and from the photograph it indicates that the upper part of the brick wall, the thicker portion, is offset on the side, which would throw the centric load into the lower wall." While, he stated that this was not the best construction, he did not say it was improper construction. He said that it was standard construction but the record is not entirely clear upon this matter and there is some doubt as to what part of the wall he referred to when he said it was

of standard construction. He testified that he could give no opinion as to the part of the wall that had fallen.

Plaintiff testified that he was never, at any time, in defendant's building but from what he saw of the outside of the building, prior to the collapse of the wall, there was nothing to indicate any defect therein.

Plaintiff insists that the court erred in sustaining defendant's demurrer to the evidence. In this connection, he devotes his brief, largely, to the negligence charged in the second count of his petition, to the effect that defendant negligently permitted that portion of the south wall which was above and higher than the building occupied by plaintiff, to collapse to plaintiff's damage. In this connection plaintiff says that the sequence of events were that defendant's extension wall fell upon the roof of plaintiff's building causing it to give way and tear away the remainder of the common wall resulting in the collapse of plaintiff's building and damage to his stock and business.

In this connection plaintiff points to the testimony of his witness, White, who inspected the second floor of defendant's building about six months before the collapse of the wall. He found on the second floor that the plaster was mostly gone; that the wall was water stained and that moisture was coming through the wall; that he went outside into the alley and saw a bulge two or three inches in the extension wall. He also calls our attention to the testimony of Jackson, that such a bulge was a serious matter and liable to induce the fall of the wall. Also the testimony of witness, White, that on the day that the wall fell he heard a rumbling noise; that he went to the rear of the building, where he was located, and saw a hole along the extension wall running ten or fifteen feet in height from the roof of plaintiff's building; that he saw the brick and debris from the hole resting upon plaintiff's roof; that the roof and rear wall of plaintiff's building was then standing intact and that the roof did not fall for a minute or two afterwards, indicating that defendant's extension wall fell first, causing the collapse of the roof of defendant's building and the subsequent falling of the remaining part of the wall and the collapse of the whole of plaintiff's building.

Defendant insists that the events did not occur as plaintiff contends and calls our attention to the testimony of the witnesses, Cooper and Godsey, especially the testimony of Cooper, that he heard no noise prior to the time he heard the "crackling" noise. From the whole testimony defendant concludes that it was the lower part of the common wall that collapsed first bringing down the extension on the roof of plaintiff's building and causing its collapse. Defendant says that, while White and Cooper were eye witnesses, the former did not see the cause and the result, while Cooper did; that Cooper was the first observer and White the later one; that, "Not until the building had

crashed behind Cooper, blasted through the door, was White apprised of anything being wrong. He ran to his rear loading dock and saw that the extension was down, the brick dust was rising from the Bell (plaintiff's) building—mute evidence of a total collapse. He says that the Bell roof stayed up a minute or so. On this slight circumstance the whole theory of appellant is built. It is of no moment in the face of the Cooper story. . . . The appellant's theory must, of necessity, embrace the hypothesis that Cooper remained in that store room, unconscious of trouble, at least a minute or two while the extension wall was crushing down the building above him. And this of Cooper, the man could hear and heed a mere 'crackling' sound, and who heard nothing before that''.

Defendant further contends that, to say the least, the cause of the collapse is left to mere speculation.

We think there is a permissible inference from the record that the extension wall fell first, causing the collapse of the roof of plaintiff's building, which dragged the remainder of the common wall down with it. There is a clear inference from the testimony of the witness, White, that this is what occurred, because he said that the roof stayed up a minute or so after the falling of the extension wall. It is fair to assume that, if the large hole that White saw in the extension wall extended below the roof of plaintiff's wall, the roof would not have stayed up for a minute or so after White first observed it. In fact, the extension wall started to fall before White arrived on the scene, for he heard a rumbling noise while he was in the building. After the roof of plaintiff's building fell, undoubtedly, the succeeding events happened rapidly. The fall of the remainder of the wall and the ceiling of the first floor of plaintiff's building may have occurred almost instantaneously. It would have required but an instant of time for White to have observed the crack in the wall near the ceiling of the first floor and reached the door, at which time the whole building was caving in.

The theory that the crack that appeared in the north wall of plaintiff's building, immediately below the ceiling of the first floor, was the first occurrence in the series of events which culminated in the wreck, is not probable, for the reason, that there is no evidence that there was any defects in that part of the wall. In fact, the testimony all shows that the lower floor of defendant's building was in a fairly good condition. The weaknesses in the wall were all above the first story and, after the collapse of the roof of plaintiff's building, it may be assumed, that it was not long before it weakened the common wall below and above the roof of the first floor of plaintiff's building. As before stated, if the lower part of the common wall, or that below the extension, collapsed first, then, it would be fair to assume that the roof would have come down at once and not remained up for a minute or two, as testified to by White. We would also expect that the rear

wall of the two story part of plaintiff's building would have been disturbed, but White said it was intact when he came out on the dock of his building. It cannot be said with any certainty that any witness saw the cause of the collapse. Certainly the witness, Cooper, did not assume to know what caused it. He could only testify as to what he saw.

It is true, Cooper testified that he heard no noise prior to the "crackling" noise and it is fair to say that he probably would have heard the extension wall falling on plaintiff's roof if that part of the wall fell first, or, before the crack appeared in the wall below the ceiling of the first floor of plaintiff's building.

Plaintiff attempts to explain the testimony that Cooper heard no noise by saying that Cooper had his attention upon his conversation with the customer; that there was a story between the roof of the building and the first floor where he was located, and that the front door of the building was open and was located so that noises from the street could interfere with his hearing. There is no evidence as to how much noise there was in the street and, of course, it may have been considerable. Notwithstanding all of this, it is probable that Cooper would have heard the noise caused by the falling of the extension wall upon the roof of the building, but it is not entirely impossible that he did not hear such noise. It is not within the province of the jury to resolve impossibilities, but it is within their power to decide probabilities or improbabilities. The testimony of the witness, White, raises such a strong inference that the extension wall fell first, that the jury might have concluded that the testimony of Cooper, that he heard no noise, only a "crackling" sound, was the result of a lapse of memory. [See Frankel v. Hudson, 271 Mo. 495, 503; State ex rel. v. Cox, 293 S. W. 122.]

Of course, the collapse may have occurred as defendant says, and we have not overlooked the rule relied upon by defendant, that where the evidence shows that the casualty may have resulted from one or two causes, for one of which, but not the other, defendant would be liable, plaintiff must show, with reasonable certainty that the cause for which defendant could be held liable was, at least, one of the proximate causes of the injury. In other words, it must be shown, with reasonable certainty, that the cause of the injury was due to the negligence of the defendant, and this must not be left to speculation. However, plaintiff's evidence need not exclude the possibility of accident or cause for which defendant is not liable, but it is sufficient to make a submissible case if there is any substantial evidence that the injury resulted from a cause for which defendant is liable. [See State ex rel. v. Haid, 28 S. W. (2d) 98, 102, 103; American Vet. Laboratories v. Glidden Co., 59 S. W. (2d) 53, 60.] And in this connection plaintiff is entitled to every reasonable inference that

may be drawn from the testimony. [State ex rel. v. Haid, *supra.*] In that case it was said, l. c. 102, 103:

"In considering the evidence on demurrer, an inference unfavorable to plaintiff that could be drawn from the facts proved should not be drawn if others more favorable to plaintiff can with equal propriety be deduced. [Rau v. Robertson (Mo.), 260 S. W. 751, 754.] In Settle v. Railroad, 127 Mo. 336, 39 S. W. 125, 48 Am. St. Rep. 633, which has been frequently cited with approval by this court, a brakeman fell from a moving car and was killed. The negligence charged was the bent and defective condition of the handhold on the car. This court said that the inference might fairly be drawn that he fell because in the emergency he was unable to secure a firm hold on the handhold because of its defective condition; that, on the contrary, it might as readily and fairly be inferred from the facts that the slipping of his feet from the footrest on which he stood was the sole cause of his fall, he having taken only such hold as would sustain his balance while on the footrest, and being unable to get a better hold when his foot slipped, for which latter cause defendant would not be liable; and that, there being evidence from which the jury could reasonably conclude that the defective condition of the handhold was the cause of the injury, the jury should have been left to draw the correct inference from the facts in evidence. [See, also, Soeder v. R. R. Co., 100 Mo. 673, 13 S. W. 714, 18 Am. St. Rep. 724.]"

The decision in State ex rel. v. Haid was by the Supreme Court *en banc* and cannot be overruled by any opinion delivered by a division. [State ex rel. v. Reynolds, 278 Mo. 554.] There is no later decision of the Supreme Court *en banc* upon the propositions of law therein enunciated contrary to that of State ex rel. v. Haid, *supra.* However, we do not construe our holding as, in any way, inconsistent with what was said in Wills v. Berberich's Delivery Co., 134 S. W. (2d) 125, 130, 131, and the other cases cited by defendant.

It was within the province of the jury to find that, it is more probable that the collapse occurred as we have outlined it, than in the manner described by defendant without speculating upon the real cause.

It is quite apparent, from what we have said, that the testimony of White is not consistent with the theory of defendant that the extension wall collapsed after the collapse of the lower wall and the ceiling of the first story of plaintiff's building, for, had this occurred the roof of plaintiff's building would not have remained in place for a minute or two after the large section of the extension wall had fallen upon it, but it would have either come down prior to the fall of the extension wall, or simultaneously with it. The jury was empowered to accept White's testimony on this point.

It is true that Godsey found a weakened condition in a part of the common wall below the extension, and that plaintiff stored several hundred gallons of paint, and a considerable weight of wall paper, along the north side of first floor of his building, but what these circumstances had to do with the fall of the wall was for the consideration of the jury.

It is claimed by defendant that the owners of the two buildings were equally responsible for the condition of the extension wall. In this connection it is urged that the extension was as much a part of the party wall, or the common wall, as the lower part. In a strict sense no part of the wall in question was a party wall. The evidence, taken in its most favorable light to plaintiff, shows that the wall stood wholly upon defendant's property. There is no evidence of any contract of any kind between the owners of the two buildings relative to its use by plaintiff's landlord. So far as the evidence shows whatever rights the landlord had in the wall were by way of prescription, which gave him the mere right of having the wall for the support of his building. It is a serious question as to whether the landlord had any rights in the extension wall. [Mollenhauer v. Wolfe, 193 N. Y. S. 348; Bright v. Bacon & Son, 131 Ky. 848; 47 C. J., p. 1331; 40 Am. Juris., p. 507; Weston v. Arnold, 8 L. R. Chancery Appeal Cases, p. 1084.] While plaintiff stands in the shoes of his landlord, so far as this question is concerned (see Reinhardt v. Holmes, 143 Mo. App. 212; Swetzel v. Holmes, 175 S. W. 871; Mahnken v. Gillespie, 43 S. W. (2d) 797; Meade v. Montrose, 173 Mo. App. 722), he only stands in the shoes of his landord as to that part of the buiding that was leased to him. [Reinhardt v. Holmes, *supra*, l. c. 225, 226.] In Bagley v. Rose, 110 Mo. App. 344, 347, it is stated: ''That which passes under a lease depends upon the intention of the parties to be ascertained from the instrument itself. The character and surroundings of the leased premises are also important factors to be considered in determining the extent of the demise as intended by the parties.'' [See, also, Reinhardt v. Holmes, *supra*, l. c. 225, 226.]

The extension wall was no part of the store building leased by plaintiff and could not have been well used by him in connection therewith. We are of the opinion that the lease did not cover it. Consequently, we are not called upon to decide whether the landlord had any right in the extension wall. Plaintiff occupies the position of a stranger so far as that part of the wall is concerned. [Reinhardt v. Holmes, *supra*.] We have examined the authorities cited by defendant and find them not in point. They have to do with the owners of strictly party walls.

From what we have said, it is our conclusion that the court erred in sustaining defendant's demurrer to the evidence.

However, as the case may be retried, it is proper to pass upon other points raised in the briefs.

Plaintiff insists that he made out a case, for the attention of the jury, under count one of his petition, which is based, in part, upon the alleged negligence of the defendant in placing additional, heavy and unusual weight upon the original wall, which was not constructed to stand the burden of such additional weight. There is no question but that defendant had the right to erect the extension without the consent of the adjoining landlord (40 Am. Juris., p. 507), so long as it was made without impairing the strength of the wall to the injury of the adjoining building. [40 Am. Juris., p. 507; 47 C. J., p. 1344; Mollenhauer v. Wolfe, *supra*; Barry v. Edlavitch, 84 Md. 95; Mary Jane Stevens Co. v. First Natl. Bldg. Co. (Utah), 57 Pac. (2d) 1099.] The wall stood for thirty-five years and considerable segments of the extension remained even after the structure under it had fallen. While there was evidence that the extension was three bricks in thickness, while the original wall was only two and, that this was not the best construction, there is no testimony that it was improper construction, and there is no evidence or inference from the evidence, that it caused the collapse. The weakening of the lower part of the wall, as shown by moisture therein, the falling of plaster and the bulge, took place after the building of the upper wall. In other words, the extension was built on a good solid wall. Of course, this connection of plaintiff is inconsistent with the first contention made that the extension caused the falling of the lower part of the wall, but there was no motion to elect between these inconsistencies in the petition. We have examined Cooper v. Sillers, 30 D. C. App. 567, cited by plaintiff and find that there was evidence in that case that the thirteen inch wall superimposed upon a nine inch wall caused the collapse of the wall. There is no such evidence in this case.

However, it is claimed by plaintiff that the maintenance of the wall constituted a nuisance; that the condition was latent and plaintiff, in relation to the wall, was in the same position as a third party, a stranger. As before stated, plaintiff was in the position of a stranger as to the extension, but not as to the wall supporting the building. We have examined the cases cited by the plaintiff and find them not in point.

It is last contended that defendant is liable as the owner of the dominant estate. In this connection it is said that the erection of the extension wall upon the lower wall constituted the appropriation of an easement by the defendant and that defendant owned the dominant estate and that the co-owners of the party wall were the owners of the servient estate; that, "If the character of the easement is such that a failure to keep it in repair will result in injury to the servient estate, or to third persons, the owner of the easement will be liable in damages for the injury so caused", citing in support thereof 19 C. J., p. 98.

There was no duty upon defendant to maintain the lower wall if it was sufficient to support the extension wall at the time the latter was

built. If such a duty were upon the defendant, then, the owner of the adjoining property would have been relieved entirely of any duty to support the wall which he was using. It has been expressly held that an owner of a party wall cannot cast the whole liability upon the other for its collapse on the theory of the existence of a nuisance. [Swetzel v. Holmes, *supra*.]

Defendant had the absolute right to construct the extension, so long as the lower wall was not so weakened thereby as to render it unsafe for the support of plaintiff's building and, in the absence of any contract between them, we cannot say that the mere physical conditions present give rise to a situation where the burden was cast upon the defendant, by implication, to maintain the lower wall for the benefit of the owner of the adjoining building. [See Paola Lodge v. Bank of Knob Noster, 238 Mo. App. 96.]

The judgment is reversed and the cause remanded. *Cave, J.*, concurs; *Shain, P. J.*, not sitting.